The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 30, 2025

**2025COA11**

**No. 24CA0119, *People in Interest of E.D.* — Dependency and Neglect — Termination of the Parent-Child Legal Relationship — Family Time Services — Family Time Upon Removal**

Applying sections 19-3-208(2)(b)(IV) and 19-3-217, C.R.S. 2024, of the Children's Code, a division of the court of appeals concludes as a matter of first impression that, when a juvenile court appropriately restricts parenting time to a therapeutic setting, a human services department can still satisfy its reasonable efforts obligation to provide family time services by making available and providing appropriate therapeutic services — in this case reintegration therapy — even if those services don't successfully result in face-to-face contact because of continuing risks to the child's or youth's health and safety from such contact.

Because the division concludes that the record supports the juvenile court's findings that the department made reasonable efforts to provide family time services to the mother in this dependency and neglect case, the division rejects her challenge to the juvenile court's reasonable efforts findings. And because the division also rejects mother's ineffective assistance of counsel claims, the division affirms the juvenile court's judgment terminating mother's parental rights.

COLORADO COURT OF APPEALS **2025COA11**

Court of Appeals No. 24CA0119
Jefferson County District Court No. 21JV131
Honorable Ann Gail Meinster, Judge

The People of the State of Colorado,

Appellee,

In the Interest of E.D., a Child,

and Concerning A.P.D.,

Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Graham*, JJ., concur

Announced January 30, 2025

Kimberly Sorrells, County Attorney, Sarah Oviatt, Assistant County Attorney, Golden, Colorado, for Appellee

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for E.D.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1      In this dependency and neglect action, A.P.D. (mother) appeals the judgment terminating her parent-child legal relationship with E.D. (the youth).

¶ 2      Section 19-3-208(2)(b)(IV), C.R.S. 2024, of the Children's Code requires a department of human services to make available and provide, "as determined necessary and appropriate by individual case plans," "[f]amily time services for parents with children or youth in out-of-home placement." Section 19-3-217, C.R.S. 2024, in turn, sets forth the requirements for family time when a child or youth has been removed from their home, including substantive and procedural limitations on a juvenile court's ability to restrict or suspend family time.

¶ 3      We conclude as a matter of first impression that, when a juvenile court appropriately restricts parenting time to a therapeutic setting, a human services department can still satisfy its reasonable efforts obligation by making available and providing appropriate therapeutic family time services — in this case reintegration therapy — even if those services don't successfully result in face-to-face contact because of continuing risks to the child's or youth's health and safety from such contact.

¶ 4 Because the record supports the juvenile court's findings that reasonable efforts were made, we reject mother's challenge to the juvenile court's reasonable efforts findings. And because mother's ineffective assistance of counsel claims also fail, we affirm the judgment terminating mother's parental rights.

## I. Background

¶ 5 The Jefferson County Division of Children, Youth and Families (the Division) filed a petition in dependency and neglect in April 2021, after multiple reports of concern about the family, including concerns about mother's mental health and arrest, which the petition alleged left no appropriate caregiver for the then-nine-year-old youth.

¶ 6 Following a contested shelter hearing, the juvenile court granted temporary custody of the youth to the Division and ordered mother to participate in therapeutic family time. After another contested hearing, the juvenile court adjudicated the youth dependent and neglected and adopted a treatment plan for mother.

¶ 7 More than two years after the youth was adjudicated, the Division moved to terminate mother's parental rights. In December

2023, the juvenile court terminated mother's parental rights following a contested hearing.

¶ 8     On appeal, mother contends that the juvenile court erred by finding that the Division made reasonable efforts to reunify the family and, in the alternative, that she received ineffective assistance of counsel. We first consider mother's reasonable efforts challenges, then turn to her ineffective assistance of counsel claims.

## II.     Reasonable Efforts

¶ 9     Mother contends that the juvenile court erred by finding that the Division made reasonable efforts because the Division failed to (1) provide appropriate family time services as required by the Children's Code; (2) make a timely referral for a psychological evaluation; and (3) make timely accommodations under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. We consider, and reject, each contention in turn below.

### A.     Applicable Law and Standard of Review

¶ 10    A human services department must make reasonable efforts to rehabilitate parents and reunite families following the out-of-home placement of abused or neglected children. §§ 19-1-103(114), 19-3-100.5, 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the

"exercise of diligence and care" for a child or youth who is in out-of-home placement, and the reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208. § 19-1-103(114).

¶ 11 To evaluate whether a human services department made reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). But a department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. So whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35.

¶ 12 The parent is ultimately responsible for using the services provided to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). The court may therefore consider a parent's unwillingness to participate in treatment when determining whether

4

a department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 13 Whether a human services department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error but review de novo its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation. *Id.*

## B. Reasonable Efforts to Provide Family Time Services

¶ 14 To satisfy the reasonable efforts requirement, a human services department must make available and provide "[f]amily time services for parents with children or youth in out-of-home placement." § 19-3-208(2)(b)(IV). Family time services, in turn, must be provided "as determined necessary and appropriate by individual case plans" and must "be designed to . . . [p]romote the immediate health, safety, and well-being" of children and youth in out-of-home placement. § 19-3-208(2)(a), (b); *see also* § 19-3-209, C.R.S. 2024 (requiring an individual case plan). A department may not restrict family time services without the juvenile court's oversight, and while the court may not delegate decisions to restrict

5

family time, it may "utilize the services of experts, such as therapists, and rely on their recommendations . . . subject to the continuing supervision and review" of the juvenile court. *People in Interest of B.C.*, 122 P.3d 1067, 1070-71 (Colo. App. 2005).

### 1. Additional Background

¶ 15 At the shelter hearing, the juvenile court ordered mother to participate in therapeutic family time but also ordered "quick contact between mom and [the youth]." To that end, the caseworker supervised an in-person visit between mother and the youth the next day. The visit ended after no more than ten minutes. The caseworker supervising the visit testified that both she and the youth felt unsafe and "the majority of that visit was traumatic" due to mother's conduct during the visit.

¶ 16 The next week, mother set up — but didn't attend — three separate intakes with Family Intervention Services (FIS) for a therapeutic visitation assessment. Several months later, mother was located in custody but refused the caseworker's attempts to coordinate contact with the youth, including through a new FIS referral. While mother was in custody, the juvenile court adopted a treatment plan for mother. The treatment plan required mother to

6

"complete an intake with [FIS] in order to begin therapeutic visitation with [the youth]" and "develop[] goals for parenting time."

¶ 17    At the end of December 2021, eight months after the Division filed the petition, mother requested contact with the youth for the first time since the case began.  In response, the Division renewed the referral for FIS.

¶ 18    When the FIS therapist met with the youth, however, the youth indicated that he didn't want to see mother.  The FIS therapist reported that forcing contact when the youth didn't feel safe was an ethical issue and closed the referral at the end of January 2022.  The caseworker, guardian ad litem (GAL),[1] placement provider, and youth's therapist all began encouraging the youth to agree to some kind of contact with mother.

¶ 19    In February 2022, mother asked that more be done to facilitate contact.  The parties agreed to facilitate communication between mother's therapist and the youth's therapist as an appropriate next step toward contact.  The court ordered the parties

---

[1] In November 2023, the youth turned twelve years old and the GAL's appointment was converted to counsel for youth pursuant to section 19-3-203(3), C.R.S. 2024.

to stay in frequent contact and to keep monitoring what more could be done to move forward with therapeutic contact.

¶ 20 A few days later, the court held an in camera interview with the youth. The court reported to the parties that the youth was "very firm right now that he doesn't want to have contact with anyone in the family."

¶ 21 In April 2022, the GAL reported that the youth was "adamant that he does not want to see his mom." Mother asked for "third party visitation services" instead of those offered by FIS. After hearing argument from the parties, the court ordered mother and the youth to continue working with their individual therapists and the two individual therapists to communicate with each other. The court also ordered the Division to hold a family meeting to consider bringing in an additional therapist; it set the matter for review the next month.

¶ 22 For the next twenty months, the juvenile court brought the matter back for review every thirty to sixty days to monitor therapeutic services that supported contact between mother and the youth.

¶ 23     Within a month after the April 2022 hearing, the Division referred the family to a reintegration specialist for therapeutic family time.  The reintegration specialist met with the youth, who "was fearful of [mother] and recounted experiences of abuse or trauma that were related to being with his mother."  In response to the youth's disclosures, the reintegration specialist worked with mother and mother's individual therapist to create a clarification letter, what the reintegration specialist called the "first step" in the reintegration process.  The reintegration specialist read the letter to the youth and offered him several options to continue contact with mother.

¶ 24     According to the reintegration specialist, the youth "was very adamant that he was not going to . . . have contact" with mother.  The reintegration specialist further testified that the youth "was very clear.  He . . . felt very afraid of her."  The reintegration specialist opined that neither the youth nor mother was in a place where they could have direct therapeutic contact and recommended that they each work separately with their individual therapists.  The reintegration specialist intended to monitor progress and move into reintegration work when both mother and the youth were ready.

Mother, however, filed a grievance against the reintegration specialist, who was then unable to continue working with the family.

¶ 25     Less than a month later, the Division made a referral to another specialist — one whom mother requested — to complete an assessment and, "if appropriate, create a plan for . . . contact to occur." The assessment specialist required mother to complete the psychological evaluation that had been ordered as part of her dispositional treatment plan and requested other collateral information before making her recommendations. The assessment specialist provided written recommendations in April 2023, and the court received detailed updates about the recommendations and progress that same month.

¶ 26     Based on those recommendations, the Division made referrals for additional services, including Trust Based Relational Intervention training for mother, a different individual therapist for the youth, and a second reintegration therapist. When mother didn't respond to the second reintegration therapist's attempts at outreach, the Division advocated for the referral to stay open longer. The second reintegration therapist eventually met with mother and

continued to meet with her until she was able to engage in the reintegration process.

¶ 27    In November 2023, the youth experienced a flashback while meeting with the second reintegration therapist, during which he had a "full neurological response" to a memory of his mother harming him with knives. The reintegration therapist recommended taking a return to mother's home "off the table" so that the youth could focus on his own trauma work. At the termination hearing, the second reintegration therapist testified that "reintegration is not the appropriate next step. The appropriate next step is for [the youth] now to do his trauma work . . . get stronger and face some of that before he's able to come back and do the work with his mom." The second reintegration therapist proposed staying involved to assist with further therapeutic reintegration work once the youth was ready.

## 2.    Analysis

¶ 28    Mother advances five related arguments in support of her contention that the juvenile court erred by finding that the Division made reasonable efforts with respect to family time. Specifically, mother argues that the court erred by (1) violating section 19-3-217

11

by restricting her family time without first conducting a hearing; (2) authorizing "a de facto total suspension" or deprivation of family time; (3) improperly delegating to others its authority to restrict family time; (4) failing to expand mother's family time beyond the therapeutic setting; and (5) failing to ensure the Division provided the youth with appropriate therapeutic services necessary to support face-to-face family time. For the reasons set forth below, we aren't persuaded that any of mother's contentions are a basis for reversing the juvenile court's finding that the Division made reasonable efforts with respect to the provision of family time services.

### a.    Section 19-3-217

¶ 29    Mother argues that the juvenile court failed to comply with section 19-3-217 by restricting her family time without first conducting a hearing. We disagree that the juvenile court erred.

¶ 30    Section 19-3-217 took effect and began applying to this case on September 1, 2021, five months after the juvenile court first limited mother's family time services to a therapeutic setting. *See* Ch. 481, secs. 1, 7, § 19-3-217, 2021 Colo. Sess. Laws 3426, 3435. The statute provides that "a parent granted family time is entitled to

12

a hearing prior to an ongoing reduction in, suspension of, or increase in the level of supervision" of family time, unless there is agreement by the parties. § 19-3-217(3).

¶ 31    We disagree with mother's arguments about the application of section 19-3-217 to her case for two related reasons.

¶ 32    First, the juvenile court's orders for therapeutic family time never changed — so there was never a "reduction in, suspension of, or increase in the level of supervision" of family time, as contemplated by section 19-3-217(3). As discussed, throughout its frequent oversight of the case, the court reaffirmed that the therapeutic level of family time was necessary for the youth's safety and emotional and mental health.

¶ 33    Second, mother's contention that a separate evidentiary hearing on the issue of family time was required isn't borne out by the statute or the facts. By the time section 19-3-217 was enacted, the youth's family time with mother had been limited to the therapeutic setting for five months. Mother appeared with the assistance of counsel at both the shelter and first appearance hearings and didn't object to the court's orders limiting her family time to a therapeutic setting. The Division maintained services

13

consistent with the order for therapeutic family time throughout the case. Although services were sometimes delayed or rendered ineffective by mother's lack of participation, they were never suspended. Instead, mother's family time remained at the therapeutic level because safety concerns were never sufficiently alleviated. Thus, the conditions set out in section 19-3-217 triggering a hearing requirement — namely, "an ongoing reduction in, suspension of, or increase in the level of supervision" of family time, § 19-3-217(3) — were never met. Instead, the court was required to — and consistently did — provide oversight of the ongoing restrictions. *See B.C.*, 122 P.3d at 1070-71.[2]

---

[2] To the extent that mother contends the failure to hold a hearing under section 19-3-217, C.R.S. 2024, was due in part to ineffective assistance of counsel, we disagree. As discussed below in Part III.A, in order to establish ineffective assistance of counsel, a parent must establish that "(1) counsel's performance was outside the wide range of professionally competent assistance; and (2) the parent was prejudiced by counsel's errors." *People in Interest of C.H.*, 166 P.3d 288, 291-92 (Colo. App. 2007) (first citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); and then citing *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003)). Given the circumstances and the lack of argument on appeal as to how a hearing might have impacted the extent of family time ordered by the court, we aren't persuaded either that counsel's performance fell below the range of professionally competent assistance or that mother was prejudiced by counsel's decision to not request a hearing under section 19-3-217.

### b. Therapeutic Family Time Services Didn't Constitute a Total Deprivation or Suspension of Family Time

¶ 34    As discussed, after a contested shelter hearing, the juvenile court ordered mother to "engage in a therapeutic visitation assessment and visitation will be based on the recommendations of the assessment." The court also authorized one in-person contact supervised by the caseworker rather than the therapeutic visitation team. That visit occurred.

¶ 35    By the next hearing, mother was scheduled for the therapeutic visitation assessment as ordered, and the court found that "therapeutic parenting time is progressing, . . . we have a process and a plan for safe parenting time, both safe for [the youth] and safe for [mother], and that hopefully will be occurring in the very near future." Mother didn't contend either at that hearing or at any subsequent hearing that the initial restriction of her family time to the therapeutic level wasn't necessary for the health and safety of the youth. Although mother didn't attend the therapeutic visitation assessment, the court reviewed the status of family time services regularly — every thirty to sixty days — and reaffirmed its order for therapeutic family time on several occasions.

¶ 36 Although mother now appears to suggest that the Division should have provided her with face-to-face family time, her reasonable efforts arguments before the juvenile court centered on the adequacy of the Division's provision of therapeutic reintegration services that might support movement toward face-to-face family time. To this end, the Division made multiple referrals for "therapeutic visitation" as the court ordered. As the first reintegration specialist testified, "[T]herapeutic visitation kind of encompasses reintegration, reunification, family therapy. It kind of depends upon where you are in the process." The first reintegration therapist went on to explain that "assessing for therapeutic contact" was also part of this continuum of therapeutic family time services. The Division consistently provided these services in compliance with its reasonable efforts obligations.

¶ 37 At the termination hearing, the juvenile court found that "an impressive treatment group . . . was put together . . . [and] every effort was made to take [mother's] wishes into account in choosing these" professionals. The court found that "despite every effort having been made to repair [her] relationship [with the youth], there has not been any significant progress in that regard."

16

¶ 38    The record supports these findings.  The Division provided family time services the day after the shelter hearing and made a timely referral for therapeutic family time.  When mother resurfaced in custody, the Division reopened the FIS referral.  When mother reengaged in services eight months into the action, the Division again reopened the referral for therapeutic family time through FIS.  When FIS recommended that family time not occur, the juvenile court assumed intensive judicial supervision over therapeutic family time services.

¶ 39    The Division contracted with no fewer than five specialists requested or approved by mother to therapeutically support the family's progress toward reintegration.  To secure providers chosen by mother, the Division engaged in single-case contracts with at least two of her requested specialists.  At the termination hearing, the juvenile court heard directly from three of these specialists, all qualified as experts in their fields, and found each of them "to be very credible."

¶ 40    Given this evidence, we reject mother's contention that the Division imposed a de facto total deprivation or suspension of family time or that it failed to make reasonable efforts to provide

family time services as section 19-3-208(2)(b)(IV) required. Instead, we conclude that when a juvenile court appropriately restricts parenting time to a therapeutic setting, as it did here, a human services department can still satisfy its section 19-3-208(2)(b)(IV) family time services obligations by making available and providing appropriate therapeutic family time services — in this case reintegration therapy — even if those services don't successfully result in face-to-face contact because of continuing risks to the child's or youth's health and safety from such contact. And because the record supports the conclusion that the Division made reasonable efforts to provide family time services, we won't disturb the juvenile court's findings and legal conclusions in this regard, notwithstanding the fact that those efforts didn't result in face-to-face contact between mother and the youth.

c.    No Improper Delegation of Authority to Restrict Family Time

¶ 41    Next, mother appears to contend that the juvenile court improperly delegated the authority to restrict or suspend her family time to the Division or other professionals in the case. The record doesn't bear this out.

18

¶ 42 Contrary to mother's argument, the Division never restricted family time — the court did. At the shelter hearing, the juvenile court heard sworn testimony from the caseworker that mother was erratic, was not able to self-regulate or manage her mental health, and wasn't meeting either her or the youth's basic needs. Based on concerns for the youth's health and safety, the juvenile court ordered mother to complete a therapeutic visitation assessment. The Division made a referral for the assessment that same day. At the shelter hearing, the court also ordered "quick contact," and a caseworker supervised a visit the next day, though it was short and "traumatic." Orders for both levels of family time may have created ambiguity about the level of supervision the court ordered after the shelter hearing. However, at the first appearance, just twelve days later, the court made clear, without objection from mother, that the "plan for safe parenting time" for both the youth and mother required movement through the therapeutic parenting time process.

¶ 43 Thus, the juvenile court didn't improperly delegate the authority to restrict or suspend family time.

### d. No Failure to Expand Family Time

¶ 44 To the extent that mother contends family time should have been expanded or moved to a less restrictive level, we discern no error.

¶ 45 The juvenile court properly granted the Division and GAL the ability to *expand* family time beginning with the shelter hearing order. *See* § 19-3-217(2) (allowing a court to grant "discretionary authority to the department and guardian ad litem to increase opportunities for additional parent-child contacts . . . without further court order"). Although there was consistent work by all parties to move family time forward, it was never expanded to include in-person contact because the youth's health and safety never allowed it.

¶ 46 The record supports that limiting mother's family time to a therapeutic setting was necessary for the youth's safety and mental, emotional, and physical health. And this necessity remained unchanged throughout the course this case. Therefore, we discern no error.

e.      The Youth's Therapeutic Services

¶ 47    Mother next contends that the Division failed to provide appropriate services to the youth to address the trauma that prevented her contact with him from happening.

¶ 48    The juvenile court found that "extraordinary efforts were made in this case by everybody, really, to try and achieve a reunification." The record supports these findings as they relate to the youth's therapeutic services.

¶ 49    The recommendations from reintegration professionals who met with the youth were consistent: the youth couldn't safely move forward in the process of therapeutic family time until he made progress in addressing his trauma through individual therapeutic services.

¶ 50    Mother argues there was "considerable delay in even attempting to therapeutically address and mitigate" the youth's trauma. But the record makes clear that the initial delay was due, at least in part, to mother's own refusal to authorize the youth to participate in therapeutic services. Additionally, the caseworker testified that other referrals were delayed until mother and the GAL could vet and approve possible therapeutic providers.

21

¶ 51 Once therapeutic services began, the youth's therapeutic progress was, as expected, slow. The first reintegration specialist testified that, because the youth had experienced unpredictability for the entirety of his childhood, "it shouldn't be expected to be a quick repair." The youth's individual therapist testified that the youth couldn't be expected to work through trauma on mother's timeline. The second reintegration therapist testified that "being in limbo . . . impact[ed] his ability to move forward in a therapeutic way. . . . [B]eing unsafe does not make it easy to do trauma work or any kind of therapy work." And because the youth "has to be ready to engage in trauma specific therapy," the second reintegration therapist testified that even trauma-specific work with a youth isn't necessarily very effective if the youth isn't ready.

¶ 52 The juvenile court found that, despite these barriers, the Division provided appropriate services to the youth to address the trauma he had experienced while in mother's care. The record supports this finding. Multiple experts opined that the youth was engaged in effective, trauma-focused individual therapy for two and a half years before the termination hearing. When the youth refused to participate in talk therapy, the Division made a referral

22

for animal assisted therapy.  The caseworker testified that the youth "made a lot of progress" in animal-assisted therapy.  The youth became more comfortable, started to disclose some areas of abuse, and completed a trauma timeline.

¶ 53     At the recommendation of mother's chosen assessment specialist, the Division changed the youth's therapist in May 2023.  The second individual therapist was approved as an appropriate provider by both mother and the assessment specialist.  The second individual therapist attempted to address the youth's trauma and was making "gradual" progress.  The second reintegration therapist opined that, after the flashback was triggered in her office, the youth was finally "willing to move into that space with [his individual therapist].  So sometimes it's timing.  Sometimes it is . . . he is just ready."

¶ 54     The caseworker testified that she observed changes in the youth as he progressed in his own therapy.  He became more aware of his body and his feelings and more confident in expressing his thoughts and wants, rather than what he thought the adults around him wanted to hear.  And as he progressed in therapy, he continued to make disclosures of abuse that occurred while in

mother's care.  All of this, taken together, resulted in the juvenile court never ordering face-to-face family time between mother and the youth.

¶ 55     We aren't persuaded that the fact that the youth didn't make sufficient progress in his therapeutic services to enable him to engage in direct contact with mother precludes a finding that the services the Division provided to the youth were appropriate.  *Cf. People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986) (holding that a treatment plan ultimately being unsuccessful doesn't mean that it was inappropriate).  Instead, consistent with our holding in Part II.B.2.b above, we conclude a human services department can still satisfy its reasonable efforts obligation by making available and providing appropriate therapeutic family time services — including therapeutic services for the youth — even if those services don't successfully result in face-to-face contact because of continuing risks to the child's or youth's health and safety from such contact.

¶ 56     Based on this standard and the facts the juvenile court found, we conclude that the record supports the juvenile court's conclusion that the Division made reasonable efforts as they pertain to providing the youth with appropriate therapeutic services.

## C. Mother's Psychological Evaluation

¶ 57    Mother next contends that the Division failed to make reasonable efforts because it didn't refer her for a psychological evaluation until late 2022.  But mother didn't raise this argument before the juvenile court, and there are no specific findings about her psychological evaluation.  More broadly, however, the court found that the Division made reasonable efforts, in relevant part, because "services were modified in this case to fit the needs of the family."  To the extent mother's argument about a delay in her psychological evaluation can be understood as a challenge to this finding, we conclude that the record supports the court's finding.

¶ 58    The Division included a psychological evaluation in the treatment plan the court adopted in July 2021.  When mother began engaging in her treatment plan in early 2022, her individual therapist reported to the caseworker that the therapist's organization had already completed a psychological evaluation with mother.  In October 2022, however, mother's individual therapist "sent a one-page document that she claimed was a psychological evaluation.  Clearly, it was not.  It was a behavioral health assessment."  Having become aware for the first time that mother

hadn't completed a psychological evaluation, the Division made a referral for a psychological evaluation within a month. The Division didn't make the referral until November 2022 because it didn't want to duplicate a service that mother's therapeutic provider insisted had been completed.

¶ 59 We aren't persuaded that this reasonable delay undermines the court's finding regarding reasonable efforts. *See My.K.M.*, ¶ 33 (the Division has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan").

### D. Reasonable Accommodations

¶ 60 Mother next contends that the Division's delay in making the referral for the psychological evaluation resulted in a delay in providing appropriate accommodations as the ADA required. We aren't persuaded.

### 1. Applicable Law

¶ 61 When a human services department knows or should know that a parent has a qualifying disability, it has an affirmative duty to make reasonable accommodations for that parent when providing rehabilitative services to that parent. *People in Interest of S.K.*,

2019 COA 36, ¶¶ 22, 25, 34; *see* 42 U.S.C. § 12102 (defining "disability" under the ADA); 42 U.S.C. § 12131(2) (defining "qualified individual" under the ADA).  When a parent is found to be a qualified individual, the juvenile court must consider whether the department made reasonable accommodations for the parent's disability when determining whether it made reasonable efforts. *S.K.,* ¶ 34.  What constitutes a reasonable accommodation varies from case to case based on the youth's health and safety needs, the nature of the parent's disability, and the available resources.  *Id.* at ¶ 39.

¶ 62     A parent is responsible for disclosing to the human services department and the juvenile court information regarding a disability and any reasonable accommodations that are needed in light of the disability.  *See People in Interest of S.Z.S.,* 2022 COA 133, ¶ 16.  A department can accommodate, and the court can address, only disabilities that are known to them.  *S.K.,* ¶ 22.

### 2.    Analysis

¶ 63     The record doesn't support mother's contention that the Division failed to provide accommodations until after the psychological evaluation was complete.  The caseworker testified

that she reached out to mother's legal team when mother was located in custody to ask about accommodations, but the caseworker was told that mother's team was trying to get records and then didn't receive any further information. The caseworker independently requested records from mother's hospitalizations and evaluations, but the caseworker was provided with conflicting diagnoses, leaving her unsure of mother's precise mental health diagnosis. The caseworker testified that, throughout the case, it was difficult for her to get information about mother's status or needs from her legal team and her service providers, even though mother had signed requested releases of information.

¶ 64 In February 2023, mother filed a notice that she was requesting accommodations under the ADA. Mother's counsel agreed that the notice "was relatively general, so it was not a specific list of accommodations." The Division requested specifics at family engagement meetings and court hearings. Although it appears that a variety of accommodations were already being made and discussed by then, the lack of specific requests for accommodations continued to be an issue.

¶ 65    Based on mother's psychological evaluation, the court ordered, with mother's concurrence, that meetings with mother should be held in person.  In-person meetings would support mother's attention and focus and allow the parties to make sure that she understood what was happening.  But at later hearings, the parties disagreed on whether holding in-person meetings was a necessary or appropriate accommodation.  Ultimately, the parties set the matter for a hearing in October 2023, mother filed a list of specific proposed accommodations just before the hearing, and the parties stipulated to the proposed accommodations.  Mother doesn't claim that these accommodations weren't provided.[3]

¶ 66    To the extent that mother argues the delayed referral for the psychological evaluation itself amounted to a failure to provide

---

[3] Rather, mother claims on appeal that the accommodation for in-person meetings that was briefly in play "exacerbated mother's disabilities."  But this isn't what she argued before the juvenile court.  Instead, in August 2023 mother argued that "new things that came to light since the family engagement meeting in June" 2023 gave rise to a new request for virtual meetings as a more appropriate accommodation, this time for mother's mental health concerns.  Thus, we decline to address this portion of her argument, made for the first time on appeal.  *People in Interest of T.E.R.*, 2013 COA 73, ¶ 30 (generally, issues not raised before the juvenile court won't be considered on appeal).

reasonable accommodations, we disagree. As discussed above, the delay was reasonable under the circumstances, where all parties believed mother had already completed a psychological evaluation. *See* U.S. Dep't of Health & Human Servs. & U.S. Dep't of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Aug. 2015), https://perma.cc/4JHL-B3GR (explaining that to comply with the ADA, treatment plans for parents with disabilities shouldn't require unnecessary services or tasks).

¶ 67    Given this record, we conclude that the Division provided the accommodations mother requested as it became aware of mother's needs under the ADA.

### III.    Ineffective Assistance of Counsel

¶ 68    Mother also contends that she received ineffective assistance of counsel before and during the termination hearing. Again, we disagree.

## A. Applicable Law

¶ 69 Divisions of this court have recognized that a parent's statutory right to counsel includes the right to effective assistance of counsel. *See People in Interest of A.R.*, 2018 COA 177, ¶ 37 (*A.R. I*), *aff'd on other grounds sub nom. A.R. v. D.R.*, 2020 CO 10 (*A.R. II*); *People in Interest of S.L.*, 2017 COA 160, ¶ 58; *People in Interest of C.H.*, 166 P.3d 288, 290 (Colo. App. 2007).

¶ 70 To successfully make an ineffective assistance of counsel claim, a parent must show that (1) counsel's performance was outside the wide range of professionally competent assistance, and (2) counsel's errors prejudiced the parent. *A.R. II,* ¶ 48; *C.H.*, 166 P.3d at 291-92 (first citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); and then citing *Ardolino v. People,* 69 P.3d 73, 76 (Colo. 2003)).

¶ 71 To state a prima facie ineffective assistance of counsel claim, a respondent must allege facts with sufficient specificity to demonstrate an entitlement to relief, including, for example, the expected names of witnesses to be called, the expected substance of testimony, and a clear explanation of how that testimony would demonstrate that trial counsel's performance was outside the wide

range of professionally competent assistance. *See C.H.*, 166 P.3d at 291.

¶ 72 To demonstrate prejudice, the parent must show a reasonable probability that, but for counsel's deficient performance or unprofessional errors, the outcome of the proceeding would have been different. *A.R. II*, ¶ 60.

¶ 73 If the parent's allegations lack sufficient specificity, we may summarily deny the ineffective assistance claim. *See C.H.*, 166 P.3d at 291. In other words, a remand for an evidentiary hearing is only required if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel. *Id.*

### B. Advocacy for Reasonable Efforts

¶ 74 Mother contends that her trial counsel provided ineffective assistance because, before the termination hearing, counsel didn't file a reasonable efforts motion challenging the Division's alleged failure to facilitate family time. Mother claims that "the issue [of family time] was allowed to languish" because there was no "contested hearing in which the shortcomings in the [Division]'s approach could have been exposed and solutions discovered."

32

¶ 75    But the record reveals that mother's trial counsel repeatedly raised reasonable efforts throughout the pendency of the case. The youth first reported he wouldn't feel safe having contact with mother in December 2021. The Division first reported that "they want to work towards contact but don't want to drag [the youth]" to family time in February 2022. At that same hearing, mother's counsel began expressing "concern [that] not enough was being done to get contact" going. Counsel then raised concerns about reasonable efforts for family time at nearly every hearing thereafter: in April, May, and June 2022; and in February, April, August, and November 2023. In addition, counsel formally objected to reasonable efforts findings at permanency planning hearings in August 2022, October 2022, April 2023, and June 2023.

¶ 76    Mother's trial counsel's efforts resulted in the juvenile court exercising close supervision over family time issues. As discussed above, the court heard updates about therapeutic family time every thirty to sixty days between the youth's refusal and the termination hearing. Importantly, mother doesn't suggest what additional "shortcomings in the [Division]'s approach" or potential solutions might have been revealed had counsel requested and the court held

a full evidentiary hearing on reasonable efforts rather than the frequent and often extensive oral reports it received.

¶ 77 Therefore, we conclude that mother hasn't raised sufficiently specific or compelling allegations to constitute a prima facie showing of ineffective assistance of counsel as it relates to the litigation of reasonable efforts.

### C. Management of Mother's Disabilities

¶ 78 Mother next contends that her trial counsel was "ineffective with respect to the management of mother's disabilities" because counsel "failed to ensure that mother received a formal psychological evaluation" until more than a year after mother's treatment plan was adopted.

¶ 79 But mother doesn't provide any authority, and we are aware of none, that requires a parent's counsel to ensure that a parent participates in services. Rather, a parent is ultimately responsible for using available services that may be necessary for complying with a treatment plan's requirements. *J.C.R.*, 259 P.3d at 1285. Here, the psychological evaluation was included in mother's treatment plan. Mother's therapeutic provider — not counsel — led all the parties to mistakenly believe that mother had completed a

psychological evaluation.  This misunderstanding persisted until October 2022.  Mother doesn't allege with any specificity how, under these circumstances, this misapprehension was her counsel's fault such that her "counsel's performance was outside the wide range of professionally competent assistance."  *A.R. II*, ¶ 48.

### D.    Timely Issuing Subpoenas and Retaining Experts

¶ 80    Mother contends that her trial counsel provided ineffective assistance by "fail[ing] to issue subpoenas or retain expert witnesses in a timely manner."  In particular, mother contends that, had her expert been retained earlier, the expert could have testified to the ways "that the D[ivision] should have approached reunification differently."

¶ 81    But there's no indication, either in mother's appeal or in the record, that mother's expert would have been able to provide the suggested testimony regardless of when she was retained.  In her affidavit, mother's expert explained that mother's legal team contacted her in June 2023 and again in November 2023.  Although the affidavit goes into some detail about the protocols for and benefits of trauma assessments and parent-child interactional

assessments, there's no mention of any proposed case review or any criticism of the Division's approach to reunification.

¶ 82 Therefore, mother hasn't asserted sufficiently specific or compelling allegations of prejudice to constitute a prima facie showing of ineffective assistance of counsel as it relates to timely retaining her expert witness.

### E. Adequacy of Expert Disclosure

¶ 83 Finally, mother contends that, "because of the inadequacy of counsel's expert disclosures, the court precluded [mother's expert] from testifying about the specialized training necessary to conduct specialized trauma-focused [cognitive behavioral] therapy [TFCBT]." Mother argues that, had TFCBT been included in the disclosure, mother's expert could have testified that "the therapists furnished by the [Division] were not qualified" to provide the therapy that the youth needed.

¶ 84 The Friday before trial, mother's counsel filed witness disclosures for eight proposed expert witnesses. The Division and the youth objected. At trial, however, the parties agreed that a portion of the affidavit from mother's expert could be used in place

of the deficient disclosures, and the juvenile court ruled that mother's expert could testify.

¶ 85 During mother's expert's testimony, the Division's counsel objected to testimony about TFCBT because it was beyond the scope of the agreed-upon disclosure. In response, mother's counsel argued that TFCBT wasn't — and didn't need to be — included in any disclosure because the testimony was being solicited to rebut testimony provided by the youth's individual therapist. Noting that mother's expert wasn't called as a rebuttal witness, the court found that the proposed testimony did "not comply with our rules here in Jeffco, our case management order, or with the rules of discovery."

¶ 86 Even if we assume without deciding that counsel's late disclosure of the expert witness fell below the range of professionally competent assistance, mother has failed to demonstrate prejudice. Indeed, even mother's offer of proof at trial didn't criticize the Division for not providing TFCBT earlier, nor has she explained how there's a reasonable probability that the lack of TFCBT altered the outcome of the proceeding. Accordingly, we reject mother's ineffective assistance of counsel claim.

## IV.  Disposition

¶ 87    The judgment is affirmed.

JUDGE BROWN and JUDGE GRAHAM concur.