24CA2164 Peo in Interest of WW 06-05-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2164
Boulder County District Court No. 23JV30139
Honorable Thomas F. Mulvahill, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of W.W. and R.B., Children,

and Concerning A.B.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HARRIS
Fox and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

---

Ben Pearlman, County Attorney, Cheryl Koh-Sicotte, Assistant County
Attorney, Boulder, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

¶ 1     A.B. (mother) appeals the judgment terminating her parent-child legal relationships with W.W. and R.B. (the children).  We affirm.

## I.     Background

¶ 2     The Boulder County Department of Housing and Human Services filed a petition in dependency or neglect based on mother's substance use.  The juvenile court adjudicated the children dependent or neglected.  The court then adopted a treatment plan for mother.

¶ 3     The Department later moved to terminate mother's parental rights.  After an evidentiary hearing, held sixteen months after the filing of the petition, the juvenile court granted the motion and terminated mother's parental rights.  The children were four and five years old at the time of termination.

## II.     Reasonable Efforts

¶ 4     Mother's sole contention is that the juvenile court erred in concluding that the Department made reasonable efforts to rehabilitate her and reunite the family because the Department failed to provide family time services.  We disagree.

1

## A.  Applicable Law and Standard of Review

¶ 5    Before a juvenile court may find a parent unfit under section 19-3-604(1)(c), C.R.S. 2024, the department must make reasonable efforts to rehabilitate the parent and reunify the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. "Reasonable efforts" means the "exercise of diligence and care" to reunify parents with their children, and services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  As relevant here, "[f]amily time services for parents with children or youth in out-of-home placement" are required.  § 19-3-208(2)(b)(IV).

¶ 6    Family time services must be provided "as determined necessary and appropriate by individual case plans" and must "be designed to . . . [p]romote the immediate health, safety, and well-being" of children in out-of-home placement.  § 19-3-208(2)(a), (b); *see also* § 19-3-209, C.R.S. 2024 (requiring an individual case plan).  A department can "satisfy its section 19-3-208(2)(b)(IV) family time services obligations by making available and providing appropriate therapeutic family time services . . . even if those

2

services don't successfully result in face-to-face contact because of continuing risks to the child's or youth's health and safety from such contact." *People in Interest of E.D.*, 2025 COA 11, ¶ 40.

¶ 7    A department may not restrict family time services without the juvenile court's oversight, and while the court may not delegate decisions to restrict family time, it may "utilize the services of experts, such as therapists, and rely on their recommendations . . . subject to the continuing supervision and review" of the court. *People in Interest of B.C.*, 122 P.3d 1067, 1070-71 (Colo. App. 2005). Family time services may be denied if the court finds "that visitation with the parent would be detrimental to the health and safety of the child." *People In Interest of E.S.*, 2021 COA 79, ¶ 23.

¶ 8    Whether a department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error and review de novo its legal determination based on those findings. *Id.*

### B. Additional Background

#### 1. Initial Family Time

¶ 9 At the shelter hearing, the juvenile court ordered the Department to provide three hours of supervised family time per week, and the first visit was scheduled for the following day. Mother cancelled the visit. The Department then attempted to provide two virtual visits, but mother cancelled both visits. Mother first participated in virtual family time with the children one month after the shelter hearing. Mother then cancelled a visit and the children refused to join the next visit.

#### 2. First Suspension

¶ 10 Two months after the shelter hearing, based on the Department's and guardian ad litem's recommendation, the juvenile court suspended family time because the children were fearful of mother. The court found that the older child had a strong reaction to contact with mother and said that "he does not want to attend the virtual visit." The court recognized "that in-person family time is very important" but suspended visits to allow the Community Infant Program (CIP) to work with the family and make recommendations regarding family time.

¶ 11    After reviewing the CIP's assessment approximately two weeks later, the juvenile court ordered that family time with the older child be "temporarily paused to assess [the child's] emotional needs, provide focused mental health/trauma treatment and to create a plan for visits where [the child] can feel safe and have increased ability to access support from all caregivers."  The court then ordered mother "to work closely with CIP to support [the child] so that family time can resume as soon as possible."  Regarding the younger child, the court ordered mother to have one virtual visit, then in-person visits could commence.

### 3.    Continued Court Oversight

¶ 12    The juvenile court reviewed the status of family time services regularly and within two months of the suspension, mother began having in-person visits with both children.

¶ 13    Around this time, the parties agreed to a schedule for in-person visits.  But mother did not attend the first four scheduled in-person visits.  Mother missed visits, in part, because she was admitted to the emergency room due to an overdose.  At the next hearing, the court ordered mother to meet with the CIP therapist

5

working with the family[1] and create a narrative so the children could understand her absence.

### 4. Second Suspension

¶ 14    After mother met with the CIP therapist to create the narrative, but before visits resumed, the juvenile court again suspended family time. The court found that it was "necessary to protect the children's mental and emotional health."

¶ 15    The court ordered that to resume family time, mother had to (1) attend three consecutive meetings with the caseworker at the same time and place as her scheduled family time; (2) engage consistently in recommended individual treatment; and (3) work with the CIP therapist to create an accurate and developmentally appropriate narrative for the children to explain her absences.

¶ 16    Within a month, the court reviewed mother's compliance. Mother had not attended three consecutive visits with the caseworker; she had tested positive for alcohol and methamphetamine; and she had violated the rules of her treatment

---

[1] The CIP contact person was Kendra Kohlhaas. Kohlhaas was the CIP program manager but also served as a therapist. We refer to her as the CIP therapist.

facility, potentially jeopardizing her stay there. The court reaffirmed the requirements mother had to fulfill to resume family time.

¶ 17    Over the next six months, the court held four more hearings to review mother's compliance, but mother did not appear at any of the hearings. Mother's last contact with the caseworker was approximately seven months prior to the termination hearing. And mother's last contact with the children was nearly one year before the termination hearing.

## C.    Analysis

¶ 18    The juvenile court concluded that the Department provided reasonable efforts, including supervised family time. As noted, the Department scheduled a family time orientation and an emergency visit to occur the day after the shelter hearing, but mother cancelled the visit. The Department offered five additional virtual visits, but mother only attended one; the children refused to attend the last visit, and mother cancelled the rest.

¶ 19    Thereafter, as the juvenile court regularly reviewed the status of family time, the Department arranged, and mother attended:

- four virtual visits with the younger child;

7

- one virtual visit with both children;

- one in-person visit with the younger child;

- one in-person visit with the older child; and

- two in-person visits with both children.

¶ 20 The Department then scheduled four additional in-person visits for which mother did not appear.

### 1. Concerns About the Children's Health and Safety

¶ 21 First, mother argues that the juvenile court erroneously withheld family time based on "largely speculative concerns about the possible impact of family time."

¶ 22 The court found that the children's health and safety required suspension of family time. For example, the court first suspended family time because it found that the older child was afraid and "pitching a pretty big fit" in response to family time. When the court suspended family time for the second time, it found that mother's lack of consistency in treatment and sobriety was "clearly evident with the children," as demonstrated by "a five-year-old who is self-harming." The record supports the court's findings:

8

- The CIP therapist testified that the older child was diagnosed with trauma-related disorder (because of his trauma history with mother) and post-traumatic stress disorder. And he exhibited a stress response at the suggestion of contact with mother. The level, duration, and difficulty of mitigating this response suggested that he experienced an "intolerable to toxic" level of stress.

- The CIP therapist next testified that the older child said that he was afraid to visit mother and in response to even the idea of contact, he would engage in "significant self-harm behaviors," a response the therapist opined was "extremely atypical."

- The CIP therapist also testified that there were "significant concerns" about the younger child's contact with mother, even though his behaviors "weren't as explicit" as the older child. The younger child's behaviors after family time indicated "signs of stress or that his little system was overwhelmed." His energy was "ramped

9

up," he had a hard time sleeping, he was agitated, and he acted out at school.

- The CIP therapist confirmed that it was unusual to require a parent to be sober for visits to occur, but it was necessary for the children's well-being. Even if mother was not intoxicated during a visit, she presented differently during periods of substance use. After long periods of sobriety, mother looked well rested, she did not fidget or shake, she could hold a conversation, and she could maintain eye contact. But if mother appeared to the children like she was using, it "could be psychologically damaging" and would be a "retraumatizing experience" for them.

- At times, mother acknowledged to the CIP therapist that she was not in a good place and that the children should not see her unless she was healthy and sober.

¶ 23 Mother contends that the older child's behavioral issues were not caused by contact with her because his behaviors continued after family time ended. But the juvenile court found, with record

10

support, that when mother stopped attending family time, the children's behaviors and emotions stabilized. In particular, the CIP therapist testified that the older child stopped self-harming and the younger child was able to "establish a routine around sleeping and taking care and calming his body and being able to be at school."

¶ 24 Given this evidence, we conclude that the juvenile court suspended family time based on legitimate concerns for the children's health and safety.

## 2. Preconditions on Family Time

¶ 25 Mother next contends that the preconditions the juvenile court imposed were more burdensome than necessary to protect the children's health and safety.

¶ 26 The record shows that the court regularly held hearings to find a balance between the children's safety and the burdens placed on mother, finding at one point that "I've peeled away as many of the requirements as I feel like I can and safely let these children have time with their mom." The court recognized that some of the requirements placed on mother were not typical but were necessary

11

given the "unique" nature of the case, including a young child engaging in self-harm.

¶ 27     In trying to find a balance, the court relied on expert recommendations to determine whether certain preconditions were necessary. *See B.C.*, 122 P.3d at 1071 (the court may "utilize the services of experts, such as therapists, and rely on their recommendations concerning a variety of issues, including visitation plans"). For example, the CIP therapist recommended that, given the older child's negative reactions, mother needed to demonstrate sobriety before re-engaging in family time, participate in substance abuse treatment, and later create an accurate and developmentally appropriate narrative for the children.

¶ 28     The CIP therapist also recommended that mother meet with the caseworker three consecutive times prior to visits resuming. The caseworker testified that the purpose of this requirement was for mother to demonstrate that she could maintain a consistent schedule for the children, which is why these visits were to occur at the same time and place as the eventual family time visits. When asked about this requirement, the CIP therapist testified that it is

difficult for a child if a parent does not show up, "[b]ut actually, what's even harder or more challenging for a young child is when there's not consistency or predictability in a parent showing up for visits." And the lack of consistency was "psychologically damaging" and "retraumatizing for these children in particular."

¶ 29  To the extent that mother argues preconditions on family time "were difficult if not impossible given the barriers" she was facing, including that she was unhoused, lacked consistent means of communication or transportation, and "otherwise lacked meaningful support systems," the court found that the Department offered many services to assist mother. Namely, the court found, with record support, that "[t]he family has been offered a number of services and supports, including but not limited to: assessments; individual and group mental health and substance abuse treatment; withdrawal management; in-patient treatment; sober living support; supervised family time; parent coaching; the Community Infant Program; substance use monitoring; assistance with housing and financial supports; early intervention evaluations; transportation assistance; and ongoing caseworker support

13

including coordination with the providers working with the family." As discussed above, the Department offered family time services and assistance from the CIP therapist. Additionally, the Department, among other things, (1) made referrals for mental health services; (2) coordinated substance use services, including detox, in-patient treatment, monitoring, and sober living; (3) offered transportation services such as Lyft/Uber, gas cards, and bus passes; and (4) attempted to work with mother on a housing voucher.

¶ 30     The record illustrates that the preconditions imposed by the juvenile court were not overly burdensome and were necessary to protect the children's health and safety.

### D.     Conclusion

¶ 31     To be sure, a reasonable efforts finding ordinarily requires the department to facilitate in-person family time between a parent and the children. But considering the entire record, we cannot say that the juvenile court erred by restricting family time in this unusual case. Because the record supports the conclusion that the Department made reasonable efforts to provide family time services,

we will not disturb the juvenile court's findings and legal conclusions.

## III.   Disposition

¶ 32     The judgment is affirmed.

JUDGE FOX and JUDGE SCHUTZ concur.