25CA0516 Peo in Interest of MB 08-28-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0516
Arapahoe County District Court No. 22JV108
Honorable Shay K. Whitaker, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of M.B., J.B., D.D., and N.D., Children,

and Concerning S.D.,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE YUN
Tow and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 28, 2025

---

Ron Carl, County Attorney, Kiley Schaumleffel, Assistant County Attorney, Aurora, Colorado, for Appellee

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for M.B.

Sheena Knight, Guardian Ad Litem, for J.B., D.D., and N.D.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

¶ 1    S.D. (mother) appeals the judgment terminating her parent-child legal relationship with M.B., J.B., D.D., and N.D. (the children).  We affirm.

## I.    Background

¶ 2    The Arapahoe County Department of Human Services filed a petition in dependency or neglect based, in part, on allegations of alcohol abuse by the parents, physical abuse of the children, sexual abuse between the children, and suicidal ideation by the oldest child.  All four children — then nine, seven, five, and four years old — were placed in foster care.

¶ 3    The juvenile court adjudicated the children dependent or neglected and adopted a treatment plan for mother.  Twenty-one months after the Department filed the petition, it moved to terminate mother's parental rights.  Fourteen months later, the court granted the motion following a two-day hearing.

¶ 4    On appeal, mother asserts that the juvenile court erred by terminating her parental rights for two reasons: (1) the Department failed to make reasonable efforts to rehabilitate her, and (2) placement with the paternal grandmother was available as a less drastic alternative to termination.

## II. Termination Criteria and Standard of Review

¶ 5 A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the children were adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6 Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. We review de novo the juvenile court's legal conclusions, including its determination as to whether the Department satisfied its reasonable efforts obligation. *See id.*; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 7     It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### III.   Reasonable Efforts

¶ 8     Mother asserts that the juvenile court erred by finding that the Department made reasonable efforts because she was not provided with family time for several months leading up to the termination hearing. We disagree.

### A.   Preservation

¶ 9     The oldest child's counsel for youth (CFY) argues that mother failed to preserve her reasonable efforts claim because she did not argue at the termination hearing that the Department's restriction of her family time amounted to a lack of reasonable efforts. By contrast, the guardian ad litem for the three younger children and the Department agree that mother preserved her claim. We need not resolve this dispute because even assuming mother did not have to preserve her reasonable efforts argument at the termination hearing, *see, e.g., People in Interest of S.N-V.*, 300 P.3d 911, 914-18 (Colo. App. 2011), we discern no basis for reversal.

## B.    Applicable Law

¶ 10    Before a juvenile court may terminate parental rights under section 19-3-604(1)(c), the department must make reasonable efforts to rehabilitate the parent and reunify the family. §§ 19-3-100.5(1), 19-3-208(1), 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" means "the exercise of diligence and care" to reunify parents with their children, and services provided in accordance with section 19-3-208 satisfy the reasonable efforts requirement. § 19-1-103(114), C.R.S. 2025.

¶ 11    As relevant here, "[f]amily time services for parents with children or youth in out-of-home placement" must be provided "as determined necessary and appropriate by individual case plans" and must "be designed to . . . [p]romote the immediate health, safety, and wellbeing" of children in out-of-home placement. § 19-3-208(2)(a), (b), (b)(IV); *see also* § 19-3-209, C.R.S. 2025 (requiring an individual case plan). A department can "satisfy its section 19-3-208(2)(b)(IV) family time services obligations by making available and providing appropriate therapeutic family time services . . . even if those services don't successfully result in face-to-face contact because of continuing risks to the child's or youth's

health and safety from such contact." *People in Interest of E.D.*, 2025 COA 11, ¶ 40.

¶ 12    A department may not restrict family time services without the juvenile court's oversight, and while the court may not delegate decisions to restrict family time, it may "utilize the services of experts, such as therapists, and rely on their recommendations . . . subject to the continuing supervision and review" by the court. *People in Interest of B.C.*, 122 P.3d 1067, 1070-71 (Colo. App. 2005). Family time services may be denied if the court finds "that visitation with the parent would be detrimental to the health and safety of the child." *People in Interest of E.S.*, 2021 COA 79, ¶ 23.

### C.    Additional Background

¶ 13    Mother's treatment plan required her to attend supervised family time with the children. However, throughout the case, mother refused to see the oldest child in person and had only infrequent virtual visits with him. And approximately twelve months before termination, mother asked to stop the virtual visits. At the termination hearing, the caseworker testified that mother "has made it clear" that the oldest child "is no longer welcome in

her home" and that "repairing that relationship . . . [is] not an option they want to pursue."

¶ 14 As for the three younger children, the juvenile court issued three separate emergency verbal orders to suspend or restrict mother's family time with them. The court held a contested hearing to address the first emergency order eighteen months before termination. Following the hearing, the parties stipulated that family time with the three younger children would transition from supervised to therapeutic visits. The parties agreed that mother would have virtual visits with them until therapeutic sessions could begin.

¶ 15 To resolve the second emergency order to suspend or restrict family time, the parties stipulated that visits between mother and the second-oldest child would be suspended until further agreement of the parties. They also agreed that family time with the two youngest children would continue "at a therapeutic supervised level" with additional requirements that mother would complete a breathalyzer test before family time, that there would be "no physical touching except for a loving touch," and "no cell phone

use" during family time. Further, the court approved the following provision as part of the stipulation:

> With regard to the two younger children, the court will order the parties to encourage the children to attend visits. However, if they refuse, the court's not gonna put the foster parents in a position where they have to force the children to get into the car. The court will order that make-up [visits] will occur, be it through virtual or through the telephone, if the children refuse.

¶ 16    A third emergency order suspending or restricting family time was issued six months before termination, prohibiting all contact between mother and the children. Mother did not appear at the emergency restriction hearing, but her attorney told the juvenile court that the attorney spoke with mother about the restriction and mother was "not contesting, at this time, the restriction going into place." The juvenile court held one additional status conference before the termination hearing, but mother did not appear, and her attorney did not request that family time resume.

### D.    Invited Error

¶ 17    Mother argues that the Department sought to suspend family time without adequate safety concerns. But we agree with the CFY that "mother acquiesced to the course of action which created the

7

issue that she now asks this court to correct." *See People in Interest of M.S.*, 129 P.3d 1086, 1087 (Colo. App. 2005) ("When a party acquiesces in the court's error, he or she is precluded from challenging the issue on appeal.").

¶ 18 Mother challenged the first emergency verbal order suspending or restricting family time, which was issued eighteen months before termination. Thereafter, however, she agreed to all further restrictions on family time, did not file any motions to lift or modify the restrictions, and did not argue at the termination hearing that her family time was improperly restricted or suspended.

### E. Family Time was Detrimental to the Health and Safety of the Children

¶ 19 Even if mother had not acquiesced to the juvenile court's family time restrictions, the record supports the juvenile court's finding that visitation with mother was detrimental to the children's health and safety. *See E.S.*, ¶ 23.

¶ 20 Mother's family time initially took place at the Department and was supervised by Department staff. The caseworker testified that mother was physically and verbally aggressive with the children and

that police sometimes had to intervene due to her behavior, which was described as "very detrimental to the children." Mother also had difficulty interacting appropriately with professionals and there were ongoing concerns about her behavior.

¶ 21 The caseworker further testified that the Department made numerous efforts to ensure that mother retained access to family time services despite her behavior. These efforts included meetings to identify additional supports, requiring mother to take breathalyzer tests before family time, and scheduling her visits separately from those involving the father of the younger two children. But none of these efforts improved mother's behavior.

¶ 22 Next, the Department attempted to transition family time to a third-party agency. The supervisor, overseeing therapeutic family time at the new facility, testified that mother was unreceptive to feedback or suggestions for improving family time. The supervisor testified that during one visit, mother confronted the second-oldest child, then nine years old, "stood over [the child] in a very aggressive way," pointed her finger at him, and "went on . . . a verbal tirade." At the end of the visit, mother and the child engaged in a "play fight" during which mother "aggressive[ly] hit" the child

"quite hard" and the supervisor "had to physically intervene between both of them in order to stop them." The supervisor testified that mother's behavior during family time became progressively worse. and "[t]he children eventually stopped wanting to come and participate in family time."

¶ 23 The supervisor testified that it became very challenging to keep the children physically and emotionally safe from mother and became increasingly difficult to redirect her. The caseworker opined that mother's ability to regulate her emotions worsened over the course of the case. The caseworker testified the Department "continue[d] to explore alternative ways" to provide family time, but by the end of the case, no provider was willing to offer family time services.

¶ 24 The juvenile court concluded generally that the Department made reasonable efforts. To be sure, a reasonable efforts finding ordinarily requires a department to facilitate in-person family time between a parent and the children. But considering the entire record, we cannot say that the juvenile court erred by restricting family time in this case. Because the record supports the conclusion that the Department made reasonable efforts to provide

family time services, we will not disturb the juvenile court's findings and legal conclusions. *See A.S.L.*, ¶ 8.

## IV.   Less Drastic Alternatives

¶ 25    Mother argues that the juvenile court erred by terminating mother's parental rights because placement with the paternal grandmother was available as a less drastic alternative. We are not persuaded.

## A.   Applicable Law

¶ 26    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *see L.M.*, ¶ 29. The court may also consider other factors, including the child's need for permanency. *L.M.*, ¶ 29.

¶ 27    For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. If the court considers a less drastic alternative but finds instead that

11

termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

¶ 28 Additionally, when a child is under six years old, as two of the children were here, the juvenile court must consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

## B. Analysis

¶ 29 The juvenile court considered but ruled out less drastic alternatives to termination. The court found that there was "a lack of family engagement or ability to even find family" except for the paternal grandmother, but she was "unwilling or unable" to be a permanent placement for the children. And the court expressed concern regarding an allocation of parental responsibilities (APR) between the parents or involving the paternal grandmother because "mother has made it very clear to this court . . . that she has no

12

intention of complying with any court orders [regarding] contact with the children."

¶ 30     The record supports the court's findings.  The caseworker testified that the Department conducted a diligent search and contacted several family members, but no relatives or kin were identified as suitable placement options.  Although the paternal grandmother  cared for the children on a short-term basis at various points during the case, she informed the caseworker that she could not serve as a permanent placement.  And even if the grandmother had agreed to take the children, the caseworker had concerns about her ability to meet the children's needs.  At the time of termination, the grandmother was seventy-three years old, lived on a limited income, and resided in a one-bedroom apartment — circumstances that would have made caring for four active children extremely challenging.  When the grandmother served as a temporary placement early in the case, she reported that she could no longer care for the children and refused to pick them up from a family time visit, forcing the Department to make other placement arrangements.  Additionally, the caseworker testified, without

providing details, that there had been reports of the grandmother being physically abusive toward the children.

¶ 31 Mother argues that an APR was in the best interests of the children because it would have avoided "adoption related loss." While mother's expert testified generally about the concept of "adoption related loss," the expert also acknowledged that adoption decisions involve "a lot of complicating factors" and must be based on the children's individual circumstances. The juvenile court considered the expert's testimony and balanced the "trauma" caused by termination against the "lack of permanency in this particular case."

¶ 32 Furthermore, the caseworker opined that an APR would not be appropriate because mother had "been very clear that she does not care what the court says." The caseworker testified that mother disregarded court orders several times, including attending the children's dental visit after being ordered not to and visiting a Department facility despite a protection order prohibiting her from doing so.

¶ 33 Ultimately, the caseworker opined that there were no appropriate options other than termination. And the juvenile court

concluded that termination was in the children's best interests. Because the record supports the court's findings, we must affirm its judgment. *See B.H.*, ¶ 81.

## V.    Disposition

¶ 34    We affirm the judgment.

JUDGE TOW and JUDGE SULLIVAN concur.