24CA2192 Peo in Interest of GS 11-26-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2192
Crowley County District Court Nos. 21JV14, 22JV6, & 23JV30012
Honorable Mark A. MacDonnell, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of G.S., E.S., Ji.S., Jas.S., Je.S., Jay.S., D.S., and Z.S.,
Children,

and Concerning Ja.S. and Jo.S.,

Appellants.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GOMEZ
Welling and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

---

Josi McCauley, Special County Attorney, Superior, Colorado, for Appellee

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for G.S.

Debra W. Dodd, Guardian Ad Litem for E.S., Ji.S., Jas.S., Je.S., Jay.S., D.S., and Z.S.

R. Jordan Edmondson, Office of Respondent Parents' Counsel, Arvada, Colorado, for Appellant Ja.S.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant Jo.S.

¶ 1 In this dependency and neglect proceeding, Jo.S. (mother) and Ja.S. (father) appeal the judgments terminating their parent-child legal relationships with G.S., E.S., Ji.S., Jas.S., Je.S., Jay.S., D.S., and Z.S. (the children). We affirm.

## I. Background

¶ 2 In August 2021, the Crowley County Sheriff's Department responded to the family home based on a call that the parents' eight-month-old son, Joh.S., had been found unresponsive and not breathing. Joh.S. was later pronounced dead.

¶ 3 The Crowley County Department of Human Services initiated Crowley County Case No. 21JV14, a dependency and neglect action concerning the six children living at the time, G.S., E.S., Ji.S., Jas.S., Je.S., and Jay.S. The Department alleged that the children were dependent and neglected based on the condition of the family home, which was described as "similar to hoarding conditions with trails and paths located throughout the house [and] debris, clothes and items stacked up that were an obvious hazard for the children," and the parents' neglect of the children, who were found dirty and malnourished. The children were removed from the home and

1

placed in foster care. Following a jury trial, they were adjudicated dependent and neglected.

¶ 4    The parents appealed, and a division of this court reversed the judgment adjudicating the children due to the erroneous admission of highly prejudicial evidence regarding Joh.S.'s death during the jury trial. *People in Interest of G.S.*, (Colo. App. No. 22CA1044, March 30, 2023) (not published pursuant to C.A.R. 35(e)).

¶ 5    While the appeal was pending, mother gave birth to D.S. The Department opened Crowley County Case No. 22JV6 concerning that child, she was placed in foster care, and the court adjudicated her dependent and neglected based on stipulations by the parents, which the court accepted.

¶ 6    In April 2023, while the cases were pending, both parents were criminally charged with offenses concerning Joh.S.'s death and with child abuse offenses concerning the six older children.[1]

---

[1] The juvenile court took judicial notice of the charges filed in the criminal cases against the parents in Crowley County Case Nos. 2023CR32, 2023CR33, and 2023CR34. Similarly, we take judicial notice of the existence — and the resolution — of those charges. *See People v. Sa'ra,* 117 P.3d 51, 56 (Colo. App. 2004) ("A court may take judicial notice of the contents of court records in a related proceeding.").

¶ 7     The Department later amended its petition in the original case, adding further allegations of physical and emotional abuse, starvation, deprivation of basic hygiene, unsafe sleeping environments, and a lack of understanding of the children's basic needs.  Then mother gave birth to Z.S., and the Department opened a third case (Crowley County Case No. 23JV30012) regarding that child, who was also placed in foster care.

¶ 8     Not long after, in October 2023, the court adjudicated the six older children and Z.S. dependent and neglected based on the parents' stipulations, which the court accepted.  The court adopted a consolidated treatment plan for both parents that pertained to all eight children in all three cases.

¶ 9     The treatment plans required the parents to

- participate in cognitive behavioral therapy to "recognize how their actions or inactions made the children unsafe previously and accept responsibility";

- address their individual mental health concerns;

- participate in family therapy when their individual therapists deemed the parents ready;

- engage in family time;

3

- maintain a safe home environment;

- engage in nutritional education and create a nutritional plan that ensures the children's individual needs are met and allows them adequate access to appropriate food;

- complete the Nurturing Parenting Program;

- complete a psychological evaluation and a parent-child interactional evaluation and follow all recommendations; and

- understand the children's developmental stages and promote prosocial growth in each child at their given stages.

¶ 10    In July 2024, the Department moved to terminate the parents' parent-child legal relationships with all eight children.  Soon thereafter, on August 1, 2024, the prosecution dismissed the child abuse charges against the parents regarding the six older children, leaving only the charges relating to Joh.S.'s death.  Following a four-day hearing in late October 2024, the court terminated the parents' parent-child legal relationships with all the children.

¶ 11    This appeal followed.  While the appeal was pending, the prosecution dismissed the remaining charges brought against

4

father, and mother pleaded guilty to criminally negligent homicide in exchange for a deferred judgment and sentence and dismissal of the other charges brought against her.

## II. Termination Criteria and Standard of Review

¶ 12     A juvenile court may terminate a parent's parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent hasn't reasonably complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2025.

¶ 13     A juvenile court's judgment terminating parental rights presents a mixed question of fact and law involving application of the termination statute to the evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  The credibility of the witnesses and the sufficiency, probative value, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are all within the juvenile court's discretion.  *Id.*  We review the juvenile court's factual findings for clear error and, thus, will set them aside only if they lack any support in the record.  *Id.* at ¶¶ 15, 48.  But we

review de novo the juvenile court's legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

## III.    Reasonable Efforts

¶ 14    Both parents contend that the Department failed to make reasonable efforts to reunite them with the children — specifically that the Department didn't make necessary referrals, rejected the services they participated in without providing timely alternatives, delayed starting family therapy, and failed to offer sufficient family time. We are not persuaded.

## A.    Mootness

¶ 15    As a preliminary matter, we address the issue of potential mootness — an issue the Department and the guardian ad litem (GAL) raised in a joint objection to mother's request for oral argument — as it affects our jurisdiction to consider this appeal. *See People in Interest of K.A.*, 155 P.3d 558, 560 (Colo. App. 2006).

¶ 16    "A case is moot when a judgment would have no practical legal effect on the existing controversy." *Diehl v. Weiser*, 2019 CO 70, ¶ 10. When issues become moot as a result of subsequent events, appellate courts will decline to render an opinion on the merits unless an exception to the mootness doctrine applies. *See id.*

6

¶ 17    The Department and GAL suggest that the issue of reasonable efforts with respect to mother is "likely moot."  Relying on section 19-3-604(1)(b)(IV), they assert that "[r]easonable efforts are no longer required for termination" of mother's parental rights in light of her guilty plea to criminally negligent homicide.  We disagree.

¶ 18    The issue of reasonable efforts as to mother is not moot, as her guilty plea is not tantamount to the juvenile court finding that (1) she is unfit because her proven parental abuse or neglect resulted in serious bodily injury or death of the children's sibling *and* (2) an appropriate treatment plan cannot be devised to address such unfitness.  *See* § 19-3-604(1)(b)(IV).  Nor has the juvenile court made any such findings.  To the contrary, the court found that an appropriate treatment plan could be — and was — devised for mother.  *See* § 19-3-604(1)(c)(I).  So even if the first element might be satisfied by the plea, the second one is not.

¶ 19    Therefore, we conclude that this issue is not moot.

## B.    Preservation

¶ 20    The Department and the GAL argue that father failed to establish that he preserved this issue for our review because he directed us to one of the other proposed orders (mother's) presented

7

to the juvenile court rather than his own. We agree that father's opening brief doesn't meet C.A.R. 28(a)(7)(A)'s requirement to provide "the precise location in the record where the issue was raised and where the court ruled." But father provided the correct citation in his reply brief, and it is clear that he raised this issue in the juvenile court.

¶ 21 The Department and the GAL further note that divisions of this court have split as to whether a parent must challenge a department's reasonable efforts before a termination hearing to preserve the issue for review. *Compare People in Interest of S.N-V.*, 300 P.3d 911, 913 (Colo. App. 2011) (the issue didn't have to be raised before the termination hearing), *with People in Interest of D.P.*, 160 P.3d 351, 355 (Colo. App. 2007) (the issue had to be raised before the termination hearing). But the Department and the GAL don't detail each parent's attempts (or lack thereof) to raise the issue of reasonable efforts before the termination hearing, and they don't ask us to find that either parent failed to preserve the issue on this basis. Accordingly, we don't address the issue of preservation further, and we will presume that the parents' arguments were preserved. *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo.

App. 2004) (declining to address an issue where a party didn't "make specific arguments" in support of it).

## C. Relevant Law

¶ 22 To determine whether a parent is unfit at a termination hearing, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *S.N-V.*, 300 P.3d at 915. "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2025. Services provided in accordance with section 19-3-208, C.R.S. 2025, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 23 Among other services, section 19-3-208 requires assessments and individual case plans for the provision of services, information and referral services to available public and private assistance resources, family time services, and placement services. § 19-3-208(2)(b). Other services, such as transportation assistance and diagnostic and mental health services, must be provided if they are determined to be "necessary and appropriate" and if the state has sufficient funding for them. § 19-3-208(2)(d).

¶ 24    In assessing a department's reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *S.N-V.*, 300 P.3d at 915, measuring the services and resources provided holistically rather than in isolation, *People in Interest of E.D.*, 2025 COA 11, ¶ 11.  But the parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).  Accordingly, a court may consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts.  *E.D.*, ¶ 12.

¶ 25    Whether a department satisfied its obligation to make reasonable efforts is a mixed question of fact and law.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  We review the court's factual findings for clear error but review de novo its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation.  *Id.*

## D. Analysis

### 1. Mother's Contentions

¶ 26 Mother contends that the Department's efforts were deficient because the Department (1) failed to make necessary referrals; (2) delayed starting family therapy; and (3) never expanded or liberalized her family time with the older children. We consider — and reject — each contention in turn.

### a. Failure to Make Referrals

¶ 27 Mother first contends that the Department "roundly" failed to make referrals for needed services, forcing the parents to independently identify providers. In support, mother points to her testimony that she didn't recall receiving any referrals from the Department, as well as father's testimony that the only referral or resource the Department provided was a life skills services referral.

¶ 28 But the juvenile court found this testimony "unconvincing" and credited the caseworker's testimony that the Department sent multiple referrals on the majority of the treatment plan objectives, though the parents opted to pursue their own treatment providers rather than work with the referral sources provided by the Department. To that end, the caseworker testified about initiating

11

referrals to several services, including cognitive behavioral therapy, Early Head Start home visitor services for child development education, life skills services to help establish a safe home environment, a facility and supervisor for therapeutic family time, and a nutrition course.

¶ 29 Mother's assertions about the Nurturing Parenting Program — the only referral she specifically discusses in this part of her brief — don't convince us otherwise. The treatment plans required the parents to complete "no less than [sixteen] weeks" of the program. Mother claims that the Department didn't submit a referral for such a program. She also claims that she and father first took a shorter version of the course, were told it was insufficient, and then "doubled up" classes at another agency and had "no way" to know the Department would deem this modality improper.

¶ 30 The record reveals, however, that the parents took the courses in the opposite order: they first "doubled up" the sixteen-session course to complete it online in eight weeks with one agency and then took an eight- to ten-week course with a second agency. As to the first course the parents took, the parent-child interactional evaluator, who testified as an expert on nurturing parenting, opined

that it wasn't proper to take the course virtually, with doubled sessions over a short period of time. And, as to the second, shorter course, the court heard evidence that a course satisfying the treatment plan requirement was offered to the parents before they started their separate course, the caseworker and an employee of the second agency reminded the parents before they started their separate course of the treatment plan requirement that the course be sixteen weeks, and the shorter course didn't contain all the information the version required in their treatment plan contained.

¶ 31 Based on this and other evidence, the juvenile court appropriately found that the parents were offered — but did not engage in — a course that met the family's needs.

### b. Delayed Family Therapy

¶ 32 Next, mother contends that the Department substantially delayed the parents from beginning family therapy due to its failure to secure a family therapist until two and a half months before the termination hearing.

¶ 33 Under the treatment plan applicable to both parents, family therapy was to commence when both parents' individual therapists deemed the parents ready for it. And it is true that once the first of

the two parents (father) was deemed ready to participate in family therapy, the Department had some difficulty securing and coordinating with family therapy providers. However, the record reveals that most of the delay in starting family therapy was caused by the lack of confirmation from individual therapists that family members were ready to participate.

¶ 34 About a year into the case, the juvenile court resolved a dispute about which family therapy provider to use. But even then, the parents' and the children's therapists were all indicating that the family members weren't yet ready for family therapy, as they had more work to do first in individual therapy.

¶ 35 About six months later, the criminal charges were filed against the parents. At that point, the parents revoked most of their releases of information, including those allowing access to mental health information, and they didn't sign new releases until several months later, in January 2024. Still, the record shows that father's individual therapist didn't recommend family therapy until May 2024. And mother's individual therapist didn't recommend family therapy until August 2024.

¶ 36    The family therapist started treatment that same month with separate sessions with the parents and the three oldest children. However, as of the time of the termination hearing, the therapist didn't believe the family members were ready to attend joint sessions all together.

¶ 37    Thus, there is no indication in the record that the Department failed to provide reasonable efforts relating to family therapy.

### c.    Family Time with the Older Children

¶ 38    Finally, mother contends that the Department didn't satisfy its reasonable efforts obligation because it never liberalized or expanded her family time with the six older children beyond one supervised three-hour session per week.

¶ 39    Mother relies on section 19-3-217(1.5)(d), C.R.S. 2025, which went into effect on January 1, 2024. *See* Ch. 284, sec. 4, § 19-3-217, 2023 Colo. Sess. Laws 1677-78. Under this new statutory provision, when a court is making decisions about family time for a child placed outside the home, it may restrict or deny family time only when doing so is necessary to protect a child's safety or mental, emotional, or physical health, and it must order family time

at the least restrictive setting and supervision level to satisfy the child's mental, emotional, or physical health. § 19-3-217(1.5)(d).

¶ 40  Here, the court initially ordered that family time be supervised, and the parents had only supervised family time throughout the case, as provided for in their treatment plans. That transitioned to therapeutic family time in September 2022 based on the parent-child interactional evaluator's recommendation from her assessment of the family's needs.

¶ 41  Nothing in the record suggests that the juvenile court entered any further orders regarding family time after section 19-3-217(1.5)(d) went into effect at the beginning of 2024 — and, certainly, mother hasn't pointed us to any such orders. Nor has mother pointed us to any place in the record where she requested a change to the modality or the amount of her parenting time based on this statute. *See Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010) (an issue is preserved when it is brought to the court's attention and the court has an opportunity to rule on it). Thus, mother's reliance on the statute now is inapposite. *Cf. E.D.*, ¶¶ 32-33 (rejecting a parent's arguments based on a different subsection of section 19-3-217 because the juvenile court hadn't

amended its orders regarding parenting time after that subsection went into effect and the parent hadn't raised the issue to the juvenile court); *see also People in Interest of M.B.*, 2020 COA 13, ¶ 14 (an appellate court generally only reviews matters presented to and ruled on by the juvenile court).

¶ 42    More generally, mother asserts that the Department prioritized the children's connections with their foster parents over their reunification with the parents.  Mother relies on *People in Interest of D.G.*, a case in which a department failed to satisfy its reasonable efforts obligation when it prohibited any face-to-face visitation between the parent and the children in the months preceding termination based on the caseworker's and other professionals' view that it was more important for the children to develop strong ties with the foster parents.  140 P.3d 299, 302-06 (Colo. App. 2006). No such facts are present here.  Mother had visits with the children, and neither the caseworker nor anyone else expressed a desire to cut off the parents' contact with the children in favor of the foster parents.  And, as noted, the family transitioned to therapeutic supervised family time based on the recommendation of the parent-child interactional evaluator following her evaluation of the family.

¶ 43      Because we reject mother's contentions of error, and because the record supports the juvenile court's findings, we discern no error in its conclusion that the Department made reasonable efforts with respect to mother.  *See A.S.L.*, ¶ 8.

## 2.      Father's Contentions

¶ 44      Father contends that the Department rejected the services he independently identified and participated in without providing any timely alternatives.  He cites three services in particular.

¶ 45      First, father points to the nutrition course he and mother took. But the record shows that the parents declined to participate in the nutrition course the Department had referred them to and instead took a course with another provider before signing releases, resulting in the provider being unaware of the family's needs.  The caseworker — whose testimony the court found "credible and reliable" — opined that the course the parents took wasn't adequate to address their nutrition issues, as it was too short and wasn't tailored to the family's needs.

¶ 46      Second, father cites the Nurturing Parenting Program.  But, as discussed above, the record supports the juvenile court's finding that the parents were offered an appropriate course but elected to

take other courses that didn't adequately meet their needs. Father also argues, for the first time in his reply brief, that the court erred by relying on the caseworker's "seventeen-year-old expertise" regarding the appropriate length of the Nurturing Parenting Program. However, we don't consider arguments raised for the first time in a reply brief. *In re Marriage of Dean*, 2017 COA 51, ¶ 31.

¶ 47 And third, father points to his progress in individual therapy and his participation in a few initial sessions with the family therapist. But he doesn't indicate that the Department refused to acknowledge his participation in therapy, nor does he develop any argument about the Department's failure to assist him in locating a therapist. In other words, father doesn't connect his participation in these services to the Department's reasonable efforts obligation.

¶ 48 On this record, we discern no error in the court's determination that the Department made reasonable efforts with respect to father. *See A.S.L.*, ¶ 8.

### IV. Fitness within a Reasonable Time

¶ 49 Arguing that they made substantial progress on their treatment plans, mother and father both contend that the juvenile

19

court erred by finding that they were unlikely to become fit within a reasonable time. We disagree.

## A. Preservation

¶ 50 The Department and the GAL again point out that father's statement of preservation directed us to one of the other proposed orders (the Department's) to the juvenile court rather than his own. Again, while we agree that father's opening brief doesn't satisfy C.A.R. 28(a)(7)(A)'s requirements, it's clear that he raised this issue in the juvenile court. And even if he hadn't, the outcome would be the same. *Cf. L&R Expl. Venture v. Grynberg*, 271 P.3d 530, 536 (Colo. App. 2011) (declining to resolve an issue where the outcome wouldn't change); *People in Interest of R.R.*, 607 P.2d 1013, 1015 n.2 (Colo. App. 1979) (same). Thus, we address the merits of father's argument.

## B. Relevant Law

¶ 51 An unfit parent is one whose conduct or condition renders them unable or unwilling to give a child reasonable parental care. *D.P.*, 160 P.3d at 353. Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet a child's physical, emotional, and mental needs

and conditions.  *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).  A juvenile court can also consider a parent's noncompliance with a treatment plan in determining unfitness.  *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 52     In determining whether a parent's conduct or condition is likely to change in a reasonable time and, thus, whether the parent can become fit in a reasonable time, the juvenile court may consider, among other things, whether any change has occurred during the proceeding.  *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003).

¶ 53     When children are under six years old, the juvenile court must also consider the expedited permanency planning (EPP) provisions, which require that they be placed in permanent homes as expeditiously as possible.  *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

## C.    Analysis

### 1.    Treatment Plan Compliance and Fitness Findings

¶ 54     In determining the parents were unfit, the juvenile court found that, while the parents were compliant with some of the objectives of their treatment plans, they weren't successful with the treatment

plans. *See E.S.V. v. People*, 2016 CO 40, ¶ 20 (a parent's partial or even substantial compliance may not result in a successful treatment plan that renders the parent fit).

¶ 55    Specifically, the juvenile court found that the parents hadn't "successfully internalize[d]" their treatment, "ma[d]e sustained changes in their behavior," or "correct[ed] the conduct and conditions that led to the [Department's] intervention." The court also found that the trauma the children had endured, "stemming from their home environment," was "ongoing and severe." And it found that for the parents to make sustained change, they needed to recognize the trauma the children had experienced and change their parenting. Yet the court found that, although the parents eventually "superficially acknowledge[d] some accountability, they were either [i]ncapable of or unwilling to take accountability for the children's circumstances and experiences in a way that evidenced acknowledgment of the need for change." And while the court didn't make express findings about whether the parents' conduct or condition was likely to change in a reasonable time, *see* section 19-3-604(1)(c)(III), it determined that "there [we]re myriad issues and barriers with the parents suggesting the[] children may never

be appropriately returned to their parents' care and custody regardless of how much time the parents are given to rehabilitate" and that "these children cannot afford to wait any longer for permanency."

¶ 56 It was undisputed that the parents had made some progress during the pendency of the case, particularly in the few months leading up to the termination hearing. For instance, the therapeutic family time facilitator testified that in the three months before the hearing, the parents showed progress in engaging with the children when the children became dysregulated. And according to the caseworker, the parents were "starting to engage in more feedback than they ha[d] before."

¶ 57 However, the record contains ample support for the court's findings that the parents didn't internalize their treatment or make sustained changes in their behavior in a way that suggested they might become fit within a reasonable time.

¶ 58 For instance, the court observed that the family home at the start of the case was "completely untenable as a residence for the children," noting that "[i]t was filled with debris to the point that movement was severely restricted" and "[t]he various places where

the children slept were so cluttered and filthy as to be shocking to the conscience." The court further found, with record support, that the parents hadn't demonstrated their ability to maintain a healthy and safe environment that could meet the children's needs and hadn't acknowledged that their home at the start of the case was unsafe for the children.

¶ 59 The court also found it "unacceptable" that the parents weren't forthcoming about their living situation during the case, including showing the Department homes where they were supposedly living that bore "little evidence that the parents were residing there" and (in at least one instance) didn't appear to contain "several of the items the parents brought to family time." Thus, it wasn't clear where the parents were living, what home they intended to bring the children home to, and whether that home was appropriate for the children. And the caseworker testified that the home the parents said they intended to return the children to (a two-bedroom, one-bathroom house) was a "small, tight environment" that wouldn't have allowed the children to use the coping mechanism at least one of them uses of "tak[ing] space when they're feeling dysregulated to keep them from biting or pinching or hitting

each other." As the court explained, "these particular children as a result of prior trauma struggle with small spaces in a way that other children may not."

¶ 60 The court also observed that malnourishment was another initial concern in the case, as "there was food in the home but the children were not always allowed to eat it." And while the parents had completed a nutrition course, mother was later seen eating food out of the trash can and hiding her food, suggesting to the caseworker that food may have been used as a source of control.

¶ 61 Other evidence indicated that the parents struggled to implement change around ensuring the children's access to an appropriate quantity and quality of food. The parents often brought meals for the children during visits, but they repeatedly brought too little food or brought expired food and spoiled milk, including in the months immediately preceding the termination hearing. The caseworker testified that there was no indication that financial constraints were preventing the parents from providing adequate food for the children. She also said the Department's concern was "less about [the parents] . . . [not] hav[ing] any understanding about

nutrition and more about [whether they] were . . . choosing to feed their kids or choosing not to."

¶ 62    As to family time, which was provided separately for the six older children and the two younger children, the court found that the parents had missed some of their visits with the older children and had displayed "inconsistent attendance" and "lack of attention" in visits with the younger children. The caseworker opined that when visiting with the six older children at once, the parents weren't able to recognize and meet all of the children's needs, leading the children to become dysregulated; seek out other providers to meet their needs; and leave visits angry, anxious, worked up, and scared. She also opined that the parents struggled to implement feedback they learned in one family time setting and apply it to similar settings with the other children. For instance, the parents received support in making more of a connection with one of the children, such as through more meaningful greetings and physical contact, but they didn't use those same strategies with the other children. The caseworker further said that father slept during nearly every single visit with the two younger children and often left for long periods of time during the visits.

¶ 63    As to family therapy, as indicated, the parents and the three oldest children had begun the process in separate sessions a few months before the termination hearing but were not yet ready to attend joint sessions together.  The family therapist, testifying as an expert in family therapy and counseling, opined that before those joint sessions could occur, "the children need[ed] to be able to feel safe and they need[ed] accountability with details and specifics of their [traumatic] experiences and if they don't feel safe, it just disrupts their development."  But according to the family therapist and her clinical supervisor, the parents hadn't yet taken accountability for the trauma the children had experienced in the home, aside from some generic statements of accountability.  The court also found that "the children's continued feelings that they lack safety" were a "barrier" to progress in family therapy.  Indeed, the three oldest children — who the court found credible — testified that they didn't feel safe returning home to the parents.

¶ 64    More broadly, the caseworker opined that the parents didn't successfully complete the treatment plans and didn't display substantial enough growth to make the children safe.  The caseworker also said she was concerned that the parents wouldn't

be able to sustain the progress they had made shortly before the termination hearing.

¶ 65   Finally, as the court noted, the EPP provisions applied to the children in all three cases.[2]  And by the time of the termination hearing, the six older children had spent over three years in foster care and the two younger children had spent their entire lives in foster care.

## 2.   Mother's Contentions

¶ 66   Despite these well-supported findings, mother contends that she was either fit or capable of becoming fit within a reasonable period.  We are not persuaded.

¶ 67   Mother first asserts that the court's fitness determination was erroneous because of the "substantial" progress she had made on her treatment plan, emphasizing in particular the treatment she

---

[2] When the Department filed the petition in the initial case, several of the children in that case were under six.  Accordingly, the court had the discretion to apply the EPP provisions to all the children and appropriately exercised its discretion in doing so.  *See* § 19-3-104, C.R.S. 2025 (a dependency and neglect hearing conducted under the EPP provisions shall, if appropriate, include all other children residing in the same household); *People in Interest of T.M.*, 240 P.3d 542, 546 (Colo. App. 2010) (the statutory scheme places discretion in the juvenile court to apply the expedited procedures to the older children when such application is appropriate).

undertook and the family time facilitator's testimony about her progress in the months before termination. Yet the juvenile court considered the evidence favoring mother's argument — such as her treatment efforts and her progress in family time — and weighed that against the contrary evidence in determining that mother was unfit. Contrary to mother's argument, the record supports the court's findings by the clear and convincing evidence standard, and we do not reweigh the evidence or substitute our judgment for that of the juvenile court. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29; *see also People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) ("[I]t is important to defer to the [juvenile] court . . . when it hears contradictory testimony on material issues.").

¶ 68 Second, mother claims that her progress on the treatment plan mitigated the child protection concerns that triggered the Department's intervention, such that the children's need for permanency was not a sufficient basis to terminate her parental rights. *See S.R.N.J-S.*, ¶ 60 ("Given that the evidence didn't support a finding that the parents were unfit, the need for permanency alone wasn't sufficient to terminate the parents' constitutional interest in the care and the custody of their children."). But, unlike

29

in *S.R.N.J-S.*, the evidence in this case supports the juvenile court's determination that mother remained unfit.  And while the court appropriately gave primary consideration to the children's needs, *see* § 19-3-604(3), as detailed above, their need for permanency was not the sole basis upon which it rested its termination decision.

¶ 69    Third, mother contends that, even if termination was proper with respect to the six older children, the court's fitness determination was in error as to the two younger children.  She asserts that the younger children are situated differently because they didn't experience any trauma in the family home (since they never lived there) and they had lived in out-of-home placement for a shorter time than the older children.

¶ 70    While mother correctly points out the divergence in experiences among the two sibling groups, the juvenile court explained that it was considering each child "separately" to reach a resolution "in the child's best interest."  *See People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo. App. 2006) ("Parental rights are personal between each parent and each child.").  Indeed, the court evaluated the family time objective as to the two younger children separately from that as to the six older children, and it correctly

noted in its ruling that the younger children had never been placed with the parents. And, contrary to mother's claim that the court "ignored" the different experiences of the younger children, the court properly considered mother's capacity to provide reasonable parental care to each of the children, given their needs. *See S.R.N.J-S.*, ¶ 59 ("[A] determination of parental fitness is intertwined with a determination of the child's best interests.").

¶ 71    Fourth, to the extent that mother contends the court erred because it didn't measure her progress from the time of the stipulated adjudications about a year before the termination hearing, we don't address that issue because mother didn't raise it in the juvenile court. *See M.B.*, ¶ 14 (we generally only reviews matters presented to and ruled on by the lower court). Further, mother didn't develop her contention on the issue until her reply brief. *See Dean*, ¶ 31 (we don't consider arguments developed for the first time in a reply brief).

¶ 72    Fifth, mother raises two constitutional contentions that she didn't fully preserve in the juvenile court. For her first contention, she argues that the Department and the court unfairly punished

her for exercising her Fifth Amendment right against self-incrimination, given the then-pending criminal charges.

¶ 73 In mother's proposed order to the juvenile court, she briefly noted the "impossible position" the parents faced of "having to choose between their constitutional right to parent and their constitutional right against self-incrimination," but she stated that "this concern is not the concern of the juvenile [c]ourt in deciding the outcome for this termination hearing." Thus, while mother indicated that she was "concerned [about] sharing anything in therapy with the children that may not be properly protected" under section 19-3-207, C.R.S. 2025, she didn't at any point ask the court to address the issue. *See Berra*, 251 P.3d at 570.

¶ 74 Nonetheless, even assuming that mother preserved the issue by alluding to her alleged constitutional dilemma, we perceive no such dilemma. That's because mother didn't actually attend family therapy sessions with the children, as the family therapist determined the parties weren't yet ready for such therapy as of the time of the termination hearing. Thus, to the extent that the caseworker and others expressed concern that mother wasn't taking accountability for her actions, it instead had to do with

32

mother not taking accountability in individual therapy sessions, family therapy sessions not involving the children, and interactions with service providers — all of which plainly were within the scope of section 19-3-207's protection.  *See* § 19-3-207(2) ("No professional shall be examined in any criminal case without the consent of the respondent as to statements made pursuant to compliance with court treatment orders . . . .").

¶ 75    Moreover, any statements mother might have made in joint therapy with the children likewise would have been protected from disclosure.  Under section 13-90-107(1)(g), C.R.S. 2025, no "person who has participated in any psychotherapy . . . , including group therapy sessions," may be "examined concerning any knowledge gained during the course of such therapy without the consent of the person to whom the testimony sought relates."

¶ 76    At any rate, as the juvenile court noted, even after the child abuse charges relating to the six older children were dismissed a few months before the termination hearing, the parents still didn't take accountability for the trauma the children had experienced.

¶ 77    Thus, it was appropriate for the juvenile court to rely in part on the parents' failure to "take full accountability for [their] prior

actions," particularly given the court's finding that "the evidence overwhelmingly exhibits the children's need for such accountability if reunification [wa]s to occur."

¶ 78 For her second constitutional contention, mother argues that the Department and the court penalized her for living in accordance with her religious beliefs, such as having a large family and letting father play a dominant role in the family, in violation of her free exercise rights under the First Amendment.

¶ 79 Instead of raising to the juvenile court the First Amendment argument she now makes on appeal, mother raised only the vague argument that "all families and parents can be rendered fit regardless of their personal beliefs" and, thus, that "[p]eople's strongly held beliefs and faith are never a barrier to the successful reunification of the family." Therefore, mother's assertion didn't adequately alert the juvenile court to consider and rule on the full scope of the constitutional challenge she advances on appeal. *See Berra*, 251 P.3d at 570.

¶ 80 With respect to the argument mother did preserve, the record doesn't suggest that the court based its conclusion that mother was unfit on her religious beliefs. To the contrary, the court didn't even

mention mother's beliefs, and it based its findings of unfitness on mother's failure to correct the specific conduct and conditions that had led to departmental intervention. *See* Part IV.C.1.

¶ 81 In sum, because the record supports the court's findings regarding mother's fitness, we won't disturb its conclusion that the termination criteria were satisfied. *See A.M.*, ¶¶ 15, 48; *S.Z.S.*, ¶ 29.

### 3. Father's Contention

¶ 82 Father similarly maintains that he could become fit within a reasonable period because he "substantially complet[ed] all aspects of his treatment plan and ma[de] positive changes throughout th[e] case." Like mother, he cites the treatment he underwent and the progress he made before the termination hearing. But the juvenile court weighed that evidence along with contrary evidence in finding that while father had complied with some of the treatment plan objectives, the plan hadn't been successful and father hadn't been rendered fit. *See* Part IV.C.1. And, as noted, we do not reweigh that evidence. *See S.Z.S.*, ¶ 29; *A.J.L.*, 243 P.3d at 250.

¶ 83 Father also contends that he should've been provided additional time to engage in individual and family therapy. Yet the EPP provisions applied to these cases, the longest of which had

been open over three years, and the court concluded that expedited permanency for the children was "critical." And no witnesses could predict a probable return home date for the children. The family therapist testified that such a timeline was "impossible to predict" but estimated (assuming cooperation by everyone) that the process could take "several weeks working with [the] parents more" and then "several months from that point forward with the children." *See S.Z.S.*, ¶ 25 (a reasonable time is not an indefinite time and must be determined by considering the children's needs).

¶ 84 Father concedes that "some delay" in starting family therapy arose from his unwillingness to take accountability, but, like mother, he asserts that he was put in the "impossible position" of having to choose between his constitutional rights to parent and against self-incrimination. To the extent that father may have preserved this constitutional argument by making statements similar to those mother made in the juvenile court, we don't perceive any constitutional problem for the same reasons we explained as it relates to mother.

¶ 85 Thus, as with mother, the juvenile court's findings regarding father's fitness are appropriate and supported by the record.

Therefore, we won't disturb the court's conclusion that the termination criteria were satisfied. *See A.M.*, ¶¶ 15, 48; *S.Z.S.*, ¶ 29.

V.    Disposition

¶ 86    The judgment is affirmed.

JUDGE WELLING and JUDGE SULLIVAN concur.