25CA1492 Peo in Interest of JD 03-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1492
Saguache County District Court No. 23JV30000
Honorable Michael A. Gonzales, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.D., a Child,

and Concerning C.D.,

Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE HARRIS
Dunn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

---

Ryan Dunn, Del Norte, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

The Morgan Law Firm, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

¶ 1      In this dependency and neglect action, C.D. (mother) appeals the judgment terminating her parent-child legal relationship with J.D. (the child). We affirm.

## I.    Background

¶ 2      In October 2022, the Saguache County Department of Social Services received a referral raising concerns about mother's mental health and her suicidal and homicidal ideations involving the child. At first, mother agreed to work with the Department and to have the child placed with mother's sister and the sister's husband (aunt and uncle). But in January 2023, after mother sought the child's return to her care, the Department filed a petition in dependency or neglect.[1] The child remained with his aunt and uncle throughout the pendency of the case.

¶ 3      After a court trial, the juvenile court adjudicated the child dependent and neglected as to mother. The court then adopted a treatment plan, which required mother to, among other things, (1) participate in mental health treatment and complete a

---

[1] Mother's two younger children were named in the petition and an amended petition, but the guardian ad litem and the Department sought termination only as to J.D.

1

medication evaluation; (2) learn parenting skills and improve her relationship with the child; and (3) attend family time in order to build and maintain a bond with the child.

¶ 4    The guardian ad litem later moved to terminate mother's parental rights, and the Department joined the motion. In April 2025, nearly two and a half years after the petition was filed, the juvenile court held a contested hearing, after which it granted the motion to terminate mother's parental rights.

## II.    Termination Criteria and Standard of Review

¶ 5    A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6    Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's

factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn from the evidence are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### III. Reasonable Efforts

¶ 7 Mother argues that the juvenile court erred in finding that the Department made reasonable efforts to reunify her with the child. We are not persuaded.

### A. Applicable Law

¶ 8 Before a juvenile court may terminate parental rights under section 19-3-604(1)(c), a county human services department must make reasonable efforts to rehabilitate the parent and reunify the family whenever appropriate. §§ 19-3-100.5(1), 19-3-208(1), 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" means "the exercise of diligence and care" to reunify parents with their children, and services provided in accordance with section 19-3-208 satisfy the reasonable efforts requirement. § 19-1-103(114), C.R.S. 2025.

Those services include screenings, assessments, and individual case plans; home-based family and crisis counseling; information and referral services; family time services; and placement services. § 19-3-208(2)(b)(I)-(V).

¶ 9 When evaluating a human services department's efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan. *People in Interest of E.D.*, 2025 COA 11, ¶ 11. But the parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. *Id.* at ¶ 12.

### B. Additional Background

¶ 10 The juvenile court ordered supervised family time for mother and the child, but it determined that the child, then nine years old, was old enough to decide whether "he . . . want[ed] to participate in a visit."

¶ 11 The record shows that the child mostly attended visits. But at least for the first ten months or so, the "interactions d[id] not present as a healthy parent-child relationship" because, as the caseworker's reports explained, mother "continue[d] to refuse to interact with [the child] during visitation," and she insisted that the

child was "lying and accusing her of doing something that she did not do."

¶ 12  The child's "accusations" concerned various traumatic events he had experienced, including the incident that led to the Department's involvement with the family.

- In October 2022, mother drove him and his infant sister to a bridge in New Mexico. During the car ride, mother called the aunt to say that she intended to jump off the bridge with both children. The child heard the conversation; he was scared and crying for most of the drive. When they arrived, mother walked onto the bridge and leaned over the rail while holding the infant. A friend of mother's arrived and diffused the situation.

- When the child was seven years old, mother said she "wanted to die." She wrapped a cellphone charger around her neck and then around the child's neck.

- Mother frequently hit him and his infant sister. During one incident, he saw his mother with her hands around the sister's neck, "shaking her."

¶ 13    The Department offered to increase mother's family time to promote bonding, but she declined, preferring to see the child only once a week, on her day off.

¶ 14    Between March 2023 and January 2024, the child attended the weekly visits on and off, even though, according to the visitation supervisor reports, mother mostly "ignored" him during the visits and, when the visits were at mother's house, he would "go to [mother's] room[,] close the door[,] and play on his own."  (At the termination hearing, the child testified that he was "scared" of visiting with his mother because he did not "feel safe around her.")

¶ 15    In January 2024, a different judge took over the case and implemented a new approach, explaining that "sometimes [ten]-year-olds have to be told that sometimes this is just how it's gonna be."  In March, still more than a year before the termination hearing, the court directed the Department to immediately resume family therapy "on a regular schedule."

## C.    Analysis

¶ 16    First, mother argues that the juvenile court erred by allowing the child to decide when family time would occur.

¶ 17    We will assume, without deciding, that the first judge's ruling, which temporarily allowed the child to decide whether to attend family time, was an improper delegation of family-time decision-making. *See People in Interest of B.C.*, 122 P.3d 1067, 1070-71 (Colo. App. 2005). Still, it does not follow that the Department failed to make reasonable efforts — either generally to reunify the family or more specifically to facilitate visitation.

¶ 18    At various times throughout the case, the Department provided a family time supervisor, a family therapist, and a reintegration specialist.

¶ 19    The family time supervisor testified that she was assigned to supervise visits for eight months from June 2023 until May 2024; the child only missed the first month of visits and started participating in July 2023. The supervisor testified that she supervised a total of forty visits, which occurred once a week and lasted approximately two hours each.

¶ 20    The family therapist testified that she worked with mother and the child "mostly weekly" for over seven months until May 2024. The family therapist explained that her work with the family ended because she did not "feel like [they] were making good progress."

7

And the caseworker testified that therapy ended because mother "felt like this wasn't going any further" and the therapist "felt like that it was not being productive for them to continue."

¶ 21   The Department then provided a reintegration therapist to supervise visits and provide therapy.  The reintegration therapist testified that she met with mother and the child together "pretty much weekly" and that she provided twenty-six sessions between September 2024 and the termination hearing.

¶ 22   Next, mother argues that "no therapeutic visits were provided," and family therapy was not provided for approximately two years.  The record refutes mother's arguments.

¶ 23   The caseworker testified that the Department "had therapeutic supervised visits from the beginning of the case" and employed a family therapist.  The family therapist, who worked with the family for over seven months until May 2024, testified that she "actually did therapy" and was "not just supervising the visit."  And the reintegration therapist, who worked with the family for approximately seven months immediately preceding the termination hearing, testified that she "facilitate[d] reintegration and therapy" with mother and the child.

¶ 24 Finally, mother argues that family time and therapy were not "meaningful" or "impactful," and the reintegration therapist "did not support the restoration" of the relationship between mother and the child. But the juvenile court found that "visits were ineffectual" because of mother's "failure to acknowledge [the child's] pain" and because she did not "work to address his needs."

¶ 25 The record supports the court's findings. The family therapist testified that "the lack of empathy from [mother] was the biggest barrier to progress" in family therapy. The reunification therapist testified that mother could not acknowledge the child's trauma and sessions were "going nowhere" because mother was not getting the mental health treatment she needed. And the caseworker testified that mother did not take accountability and instead blamed the child.

¶ 26 We therefore discern no basis to reverse the juvenile court's conclusion that the Department made reasonable efforts to reunify the family.

IV.    Fitness Within a Reasonable Time

¶ 27    Mother contends that the juvenile court erred when it found that she could not become a fit parent within a reasonable period of time.  We are not persuaded.

A.    Applicable Law

¶ 28    A parent is unfit if her conduct or condition renders her unable or unwilling to give her child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 29    When deciding whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition.  *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 30    What constitutes a reasonable time is fact-specific and must be determined by considering the physical, mental, and emotional

10

conditions and needs of each particular child. *Id.* at ¶ 25. A reasonable time is not an indefinite time. *Id.* And even when a parent has made recent progress on a treatment plan, the court is not required to give the parent additional time to comply. *See id.* at ¶¶ 24-25.

## B. Analysis

¶ 31 Mother argues that she made substantial progress on her treatment plan and therefore should have been provided additional time. The juvenile court acknowledged that mother complied with many objectives of her treatment plan but concluded that the treatment plan was not successful. Specifically, the court found that "[m]other's relationship with [the child] only deteriorated over time" and that she was unable to safely and appropriately parent the child.

¶ 32 The record supports the court's findings. The reintegration therapist testified that mother and the child were unable to work through the child's trauma in therapy because mother was not getting appropriate treatment for her own mental health issues, specifically, her histrionic personality disorder. The therapist also testified that mother made the sessions "all about her" and could

not acknowledge the child's experiences. The therapist opined that the relationship between mother and the child was "beyond repair" and that even if the child was able to process his trauma and mother was working hard in individual therapy, it would still take a couple of years to repair that relationship. And the caseworker testified that the child had "in [his] mind divorced" mother because "that basic element of trust ha[d] been degenerated" and the child did not "see any way for that to be repaired."

¶ 33 The family time supervisor testified that visits were ineffective because mother did not take accountability for her behavior. The supervisor explained that mother did not acknowledge the child during the first couple of months the supervisor was overseeing visits (beginning in June 2023); that mother called the child a liar and a "dumbass"; and that mother told the child that "all of this was his fault." And mother testified that she did not understand why the child had negative feelings toward her or any "concerns about living with" her.

¶ 34 The family therapist testified that mother's lack of empathy was the biggest barrier to progress. And the caseworker testified that although mother completed a parenting class, she did not

implement the principles taught in that class in her interactions with the child.

¶ 35    Ultimately, the reintegration therapist opined that it would be in the child's best interest to stop family time until both he and mother could receive the individual treatment they needed. The caseworker opined that the treatment plan was not successful and that mother was not a fit parent because she did not form a "healing bond" with the child and was therefore unable to meet the child's emotional needs.

¶ 36    For the nearly two and a half years the case was open, the child consistently and unequivocally said that he did not want to return to mother's care. At the termination hearing, the child, who was then thirteen, testified that he no longer loved mother and described being unable to bond with her. He told the court that he wanted to live with aunt and uncle "forever."

¶ 37    To the extent the juvenile court concluded that the treatment plan was not successful because mother "failed to build and maintain any bond with [the child]," she argues that she was not provided with the appropriate reunification services. But, as examined in detail above, the Department made reasonable efforts

in providing reunification services, including family time, family therapy, and reunification therapy.

¶ 38    Accordingly, given this record, we discern no error in the court's findings that mother was unfit and unlikely to become fit within a period of time that was reasonable for the child.

## V.    Less Drastic Alternative

¶ 39    Mother contends that the juvenile court erred by finding no less drastic alternatives to termination existed.  She maintains that the court could have ordered an allocation of parental responsibilities (APR) to aunt and uncle.  We disagree.

## A.    Applicable Law

¶ 40    Implicit in the statutory criteria for termination is the requirement that the juvenile court consider and eliminate less drastic alternatives.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. When considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).

¶ 41    For a less drastic alternative to be viable, it must be the "best" option for the child.  *A.M.*, ¶ 27.  For that reason, if the court

considers a less drastic alternative but finds that termination is in the child's best interest, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. We are bound by that determination if the court's findings are supported by the record. *People in the Interest of B.H.*, 2021 CO 39, ¶ 80.

### B. Analysis

¶ 42    The record supports the juvenile court's conclusion that an APR would not serve the child's best interest.

¶ 43    The child's therapist described the child's significant mental health needs, and the caseworker described the negative impacts caused by the child's interactions with mother in therapy and family time. *See People in Interest of A.R.*, 2012 COA 195M, ¶ 38 (In determining whether placement with a relative . . . is a viable less drastic alternative to termination, the court may consider . . . whether an ongoing relationship with the parent would be beneficial or detrimental to the child.").

¶ 44    The caseworker opined that the child needed permanency because the case had been open for two years and three months. The caseworker also testified that the aunt and uncle preferred the permanence of adoption over an APR, in part because of "their long

relationship with [mother] and their experience of her erratic behaviors and her mental health challenges." *See People in Interest of Z.M.*, 2020 COA 3M, ¶ 31 (a juvenile court may consider the placement preference for adoption over an APR).

¶ 45　Ultimately, the caseworker opined that an APR would not provide sufficient permanency and that termination was in the child's best interest. Thus, we conclude that the record supports the juvenile court's finding that an APR was not a viable less drastic alternative to termination.

## VI.　Disposition

¶ 46　The judgment is affirmed.

JUDGE DUNN and JUDGE MOULTRIE concur.