25CA1671 Peo in Interest of NKS 04-23-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1671
Rio Blanco County District Court No. 23JV1
Honorable Anne K. Norrdin, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of N.K.S. and W.J.S., Children,

and Concerning I.R.S,

Appellant.

---

JUDGMENT AFFIRMED

Division A
Opinion by JUSTICE MARTINEZ*
Román, C.J., and Ashby*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 23, 2026

---

Rose Pugliese, County Attorney, Meeker, Colorado; BTR Law, LLC, Benjamin T. Rehbein, Grand Junction, Colorado for Appellee

Cassie L. Coleman, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    In this dependency and neglect proceeding, I.R.S. (father) appeals the judgment terminating his parent-child legal relationships with N.K.S. and W.J.S. (the children).  We affirm.

## I.    Background

¶ 2    In November 2022, the Rio Blanco County Department of Human Services received a report of domestic violence and substance use in the parents' home.  For approximately three months, the parents worked with the Department on a voluntary basis.  However, when the parents did not comply with the agreed-upon safety plan, the juvenile court granted the Department's request to remove the children and place them in foster care.

¶ 3    Shortly thereafter, the Department filed a petition in dependency and neglect concerning the then-three-year-old and one-year-old children.  Father admitted the allegations in the petition, and the juvenile court adjudicated the children dependent or neglected.  The court later adopted a treatment plan for father that required him to (1) engage in substance abuse treatment and demonstrate sobriety; (2) maintain stable employment and housing; (3) gain an understanding of the children's needs and demonstrate

appropriate parenting skills; (4) address his mental health issues; (5) engage in domestic violence treatment; and (6) refrain from further involvement in the criminal justice system.

¶ 4 In August 2024, the Department moved to terminate the father's parental rights under section 19-3-604(1)(c), C.R.S. 2025. After a three-day hearing, the juvenile court denied the Department's motion, finding that the Department failed to prove that father could not become fit within a reasonable time and that no less drastic alternatives to termination existed.

¶ 5 Thereafter, the guardian ad litem (GAL) moved to terminate father's parental rights and the juvenile court held a second termination hearing. After considering the evidence, the court found that in the six months after the first termination hearing, father had not improved or addressed the issues that brought the family to the Department's attention. Specifically, the court found that despite the Department's efforts to rehabilitate father, he (1) had admitted to using methamphetamine a month before the hearing; (2) was not engaged in substance abuse treatment; (3) had not obtained stable housing; (4) had not completed his domestic violence classes; (5) still struggled to regulate himself and act

appropriately during family time; and (6) refused to allow his probation officer to speak to the Department about his probation compliance. The court further found that father was unlikely to become fit in a reasonable time and that there were no less drastic alternatives to termination. Consequently, the court terminated father's parental rights approximately two and a half years after the filing of the petition.

## II. Motion to Continue

¶ 6 Father contends that the juvenile court abused its discretion by denying his motion to continue the termination hearing so he could obtain an expert witness. We are not persuaded.

### A. Applicable Law and Standard of Review

¶ 7 An indigent parent has a statutory right to the appointment of an expert witness of his or her own choosing at state expense. *See* § 19-3-607(1), C.R.S. 2025. A request for the appointment of an expert witness must be made within a reasonable time prior to the termination hearing. *People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005).

¶ 8 In ruling on a motion to continue, the juvenile court should balance the need for orderly and expeditious administration of

justice against the facts underlying the motion, while considering the child's need for permanency. *People in Interest of T.M.S.*, 2019 COA 136, ¶ 44. When a child is under six years old at the time the petition in dependency and neglect is filed, the expedited permanency planning (EPP) provisions apply, and the juvenile court cannot delay or continue the termination hearing absent a showing of good cause and a finding that the delay would serve the best interests of the child. §§ 19-3-602(1), 19-3-104, 19-1-123, C.R.S. 2025.

¶ 9 We review a ruling on a motion to continue for an abuse of discretion. *People in Interest of T.E.M.*, 124 P.3d 905, 908 (Colo. App. 2005). A court abuses its discretion when its ruling is manifestly arbitrary, unfair, or unreasonable or when it misapplies or misconstrues the law. *People in Interest of E.B.*, 2022 CO 55, ¶ 14. "The totality of the circumstances is relevant when determining whether the trial court committed an abuse of discretion by denying a continuance." *Id.* (quoting *People in Interest of D.J.P.*, 785 P.2d 129, 131 (Colo. 1990)).

## B.    Additional Facts

¶ 10    Approximately three weeks after the GAL moved to terminate father's rights, which was one month before the second termination hearing, father filed a motion to continue the hearing.  He argued that without a continuance, he would be "deprived of any meaningful opportunity to utilize the expert to which he [was] entitled" under section 19-3-607.  Specifically, he asserted that the expert he had selected (the same expert mother had retained for the first termination hearing) was unable to complete her evaluation and report before the hearing date.  The Department and GAL objected to a continuance, arguing that a delay would not be in the children's best interests.

¶ 11    Following a hearing, the juvenile court denied father's motion. The court noted that it was required to be "particularly mindful of [the] child[ren's] need for stability and the potential harm caused by delays" because the children were under six years old, which was a "critical bonding and attachment period."  It then found that a continuance was not in the children's best interests because their "dire need for permanency" was "present and obvious" to the court at the time of the first termination hearing, and that need still

existed. The court further found that father had not established good cause for a continuance, noting that the expert witness father selected had already "become acquainted with this particular family" because she had completed an evaluation and testified at the first termination hearing.

¶ 12 Nonetheless, the juvenile court stated that it "understood [father's] statutory right to an expert witness" and that it would appoint the requested expert if father wanted to utilize her "in some other capacity" that would allow her to complete a report and testify at the already-scheduled hearing.

## C. Analysis

¶ 13 The record supports the juvenile court's finding that a continuance was not in the children's best interests. Indeed, when the motion to continue was filed, the case had been open for over two years and the children had been in foster care the entire time. Moreover, at the first termination hearing — approximately five months before father's motion to continue the second termination hearing — the caseworker testified that the children already had "severe attachment issues" and opined that they needed permanency "sooner than later."

¶ 14    Further, the juvenile court made specific findings, supported

by the record, that continuing the second termination hearing was

not in the children's best interests.  After making these findings, the

court could not continue the hearing regardless of whether father

established good cause to continue it.  *See* § 19-3-104 (a

termination hearing in an EPP case "must not be delayed or

continued" unless there is a showing of good cause *and* the court

finds that the continuance is in the children's best interests).

¶ 15    To the extent that father argues that the denial of the

continuance deprived him of his statutory right to an expert

witness, which made the proceedings fundamentally unfair, we

disagree.  First, the record does not indicate that the juvenile court

denied father's request for an expert witness.  Rather, the court

denied his motion to continue but still offered to appoint the

requested expert in a different capacity, such as a consultant, so

that she could complete a report and testify at the

already-scheduled hearing.  In other words, the court determined

that the scope of the expert's opinion would need to be limited

because the children's "dire" need for permanency required quick

resolution of the proceedings.  *See People in Interest of E.S.*, 49 P.3d

1221, 1224 (Colo. App. 2002) (a parent's "statutory right to an expert witness may be limited in scope" if necessary to meet the child's needs because a parent's right to due process is "subject to the power of the state to act in the best interests of the child").

¶ 16　　Second, even assuming without deciding that father's due process rights were violated by the denial of the continuance, father has not demonstrated actual prejudice. *See E.B.*, ¶ 17 (a parent arguing that a denial of a continuance violated due process must demonstrate actual prejudice). Father claims that the expert witness was necessary to present an "effective" and "zealous" defense, and states in general terms what the witness might have said had she completed her evaluation. However, father does not explain how that testimony would have changed the outcome of the case, particularly in light of the juvenile court's findings that father failed to comply with nearly all of the objectives of his treatment plan. *See* C.R.C.P. 61; C.A.R. 35(c); *People in Interest of C.C.*, 2022 COA 81, ¶ 20 (an appellate court may disregard any error if it can be said with fair assurance that the error did not substantially influence the outcome of the case or impair the basic fairness of the trial).

¶ 17    Based on the foregoing, we perceive no abuse of discretion because the juvenile court properly weighed the reason proffered for the continuance with the need for prompt resolution of the proceeding and the children's best interests.

### III.    Reasonable Efforts

¶ 18    Father contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him and reunite him with the children.  Specifically, he argues that the Department failed to provide adequate family time.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 19    The juvenile court may terminate a parent's rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 20    To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family.

9

*See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2025. Services provided in accordance with section 19-3-208, C.R.S. 2025, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 21    As relevant here, a department must provide family time services for parents with children in out-of-home placement if those services are determined to be necessary and appropriate by the individual case plan. § 19-3-208(1), (2)(b)(IV); *People in Interest of E.D.*, 2025 COA 11, ¶ 14. The children's health and safety are the paramount concerns in determining whether, and what type of, family time services are necessary and appropriate. *See People in Interest of A.A.*, 2020 COA 154, ¶ 17. Family time services shall be designed to promote the children's health, safety, and well-being; facilitate the speedy reunification of a parent and their children; and promote the children's best interests. *Id.*; *see* § 19-3-208(2)(a).

¶ 22    The juvenile court should analyze a department's efforts by considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the

completion of the entire treatment plan. *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. A parent is ultimately responsible for using the services to obtain the assistance needed to comply with their treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

¶ 23     Whether a department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. Therefore, we review the juvenile court's factual findings for clear error but review de novo its legal determination that the Department made reasonable efforts to rehabilitate the parent. *Id.*

### B.     Additional Facts

¶ 24     When the case opened, the juvenile court ordered the Department to provide supervised family time for father. The Department arranged for the children to have in-person family time with father three times per week in Rangely, Colorado (where father lived). However, because the children's foster home was in Meeker, Colorado, the Department became concerned that traveling to and from Rangely three times per week was too much for the children — the children were spending about two hours in a car every time they

had a visit. Consequently, the Department changed father's family time to one visit per week in Rangely and two visits per week in Meeker. At that point, the Department was transporting the children to their family time in Rangely and providing father with gas vouchers to drive to Meeker for the family time there. But father made it to only four out of thirty-five sessions scheduled in Meeker. Thus, starting in August 2023, the Department changed the family time schedule to one in-person visit in Rangely and two virtual visits every week.

¶ 25 In January 2024, the Department and the GAL moved the juvenile court to order that the level of family time supervision increase to a therapeutic setting. After a contested hearing, the court found that the children were "not doing well emotionally in connection with visits" and that their attachment to the parents was "growing more disorganized rather than improving." The court then ordered that father's family time decrease to one in-person therapeutic visit per week.

¶ 26 Thereafter, the Department provided one therapeutic visit per week until the first termination hearing in January 2025. Shortly after that hearing, the therapeutic family time provider resigned

because, according to the caseworker, there were scheduling issues and the provider did not believe father was willing to implement her recommendations. Within five weeks, the Department had arranged therapeutic family time with a new provider. Consequently, from April 2025 until the second termination hearing, the new provider facilitated weekly in-person therapeutic visits for father and the children.

## C.     Analysis

¶ 27     In its oral termination ruling, the juvenile court found that the Department made reasonable efforts to rehabilitate father by "providing screenings, assessments, individual case plans, information and referral services, visitation services, transportation assistance, placement services for the children and case management." It found that "despite those efforts," father was still unfit.

¶ 28     Father challenges the court's reasonable efforts finding only as it relates to family time. He does not assert that the Department wholly failed to provide family time services, as required under section 19-3-208(2)(b)(IV). Rather, he asserts that the family time provided by the Department was inadequate because (1) the virtual

13

visits did not provide father with an opportunity to maintain his connection with the children; (2) when the children began acting out after family time, the Department sought to restrict father's family time instead of providing more supportive in-person family time; and (3) the Department failed to provide any family time for five weeks after the first therapeutic family time provider terminated her services. We reject all three arguments.

¶ 29 First, the record indicates that the Department's decision to convert two of father's weekly visits from in-person to virtual was based, at least in part, on father's failure to attend the in-person visits in Meeker. In fact, around the time the visits were converted to virtual, the caseworker reported that the Department made that decision "in hopes of more participation" from father. It was also based on the oldest child's educational needs (her preschool schedule). Even after the Meeker visits were converted to virtual visits, the Department was still transporting the children to Rangely for weekly in-person visits with father.

¶ 30 Second, the Department's decision to move for an increase of family time supervision level does not show that it failed to make reasonable efforts. Rather, the Department moved for therapeutic

14

family time because it was concerned that the supervised visits with father had become emotionally harmful to the children. *See* § 19-3-217(d), C.R.S. 2025 (a court may restrict family time if it is necessary to protect a child's safety or mental, emotional, or physical health). Moreover, the level of supervision for family time is within the juvenile court's purview, not the Department's. *People in Interest of B.C.*, 122 P.3d 1067, 1070-71 (Colo. App. 2005) (family time orders are always "subject to the continuing supervision and review by the trial court, which, in the final analysis, retains ultimate decision-making authority in the case"). Here, based on the evidence presented at a contested family time hearing, the juvenile court found that an increase to therapeutic supervision and a decrease to one visit per week were necessary to protect the children's emotional well-being. Thereafter, the Department provided the type and frequency of family time ordered by the court.

¶ 31    Third, although the caseworker admitted that father did not have any family time in the five weeks after the first therapeutic family time provider resigned, the record indicates that the Department made significant efforts to provide family time during that period. Specifically, the caseworker testified that when she

15

found out that the first therapeutic family time provider would be resigning, she asked that provider for recommendations of other providers who could facilitate therapeutic family time. The provider gave "a couple" of recommendations, and the caseworker contacted them. The caseworker then "researched and reached out" to "more than eight, if not upwards of twelve" additional providers to find a new therapeutic supervisor. Eventually, after speaking to one of the providers three times, the caseworker "begged and pleaded enough" to convince that provider to take the referral. Thereafter, father's weekly therapeutic visits resumed and continued through the second termination hearing. Thus, the record belies father's assertion that the five-week lapse in family time showed a lack of reasonable efforts to reunify him with the children.

¶ 32    Moreover, even if the Department's efforts were lacking during the time period in which father did not have family time, father does not explain how five weeks without family time in a two-and-a-half year case rendered the Department's overall efforts unreasonable. In light of the ample evidence showing that the Department provided numerous services (including family time services) to father throughout the case, we do not see how the five weeks

16

without family time rendered the juvenile court's reasonable efforts finding erroneous. *See My.K.M.*, ¶ 33 (to analyze reasonable efforts, the court must look at the totality of the circumstances).

¶ 33 Based on the foregoing, we discern no error in the juvenile court's determination that the Department made reasonable efforts to rehabilitate father and reunite him with the children.

## IV. Less Drastic Alternatives

¶ 34 Last, father contends that the juvenile court erred by finding that there were no less drastic alternatives to termination. He asserts that an allocation of parental responsibilities (APR) between him and mother was a viable permanency option. We discern no error.

## A. Applicable Law and Standard of Review

¶ 35 The consideration and elimination of less drastic alternatives are implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40. In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. A juvenile court may also consider, among other things, (1)

17

whether an ongoing relationship with a parent would be beneficial to the child, which is influenced by a parent's fitness to care for the child's needs, *see People in Interest of A.R.*, 2012 COA 195M, ¶ 38, and (2) whether the child is bonded with the parent, *see People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009).

¶ 36    For a less drastic alternative to be viable, it must do more than adequately meet the child's needs; it must be in the child's best interests. *A.M.*, ¶ 27. Long-term or permanent placement with a family member, short of termination, may not be in the child's best interests if it does not provide the permanence that adoption would provide or otherwise meet the child's needs. *A.R.*, ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the alternative and order termination. *A.M.*, ¶ 32.

¶ 37    "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34. Thus, when a juvenile court considers less drastic alternatives but instead finds that termination is in the child's best interests, we are bound to affirm the decision so long as the record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 38     As a threshold matter, the Department and GAL argue that father failed to preserve his less drastic alternatives argument because father offered no evidence and made no argument about an APR at the termination hearing. Because we discern no error, we do not find it necessary to determine whether this argument must be preserved and, if so, whether father preserved it.

¶ 39     The juvenile court considered several less drastic alternatives to termination — an APR between the foster parents and father, an APR between mother and father, long-term foster care, and a guardianship. But it found that none of those options would be in the children's best interests. The court's conclusion was based on its consideration of "the children's age[s], their developmental needs, [and] . . . the length of time they [had] been placed outside of the home."

¶ 40     Regarding the possibility of permanent foster care, the juvenile court found that the children's needs suggested a "secure form of permanency," and that, "[p]ermanent foster care would be a limbo state that would be confusing to them and undermine their feeling of security, safety and permanency." The court concluded that,

"[a]ny APR agreement between the child's caregiver and father would likely result in conflict that would be emotionally unsafe, potentially physically unsafe, and threatening to the girls' permanency".

¶ 41 As relevant to father's appellate argument, the court found that an APR between father and mother was not a viable option because "the domestic violence between the parents [had] not been remedied" and because "denying termination for father and hoping that an APR . . . could be devised" would cause further delay, which was not in the children's best interests.

¶ 42 The record supports the juvenile court's findings. The caseworker, who testified as an expert in child welfare and case management, opined that termination was in the children's best interests because throughout the case the children had become increasingly dysregulated and escalated before, during, and after their family time with father. The caseworker testified that even if mother became fit at some point in the future, an APR between the parents would not be in the children's best interests because, at the time of the hearing, father was still "demonstrating domestic violence behaviors" toward mother. For example, the caseworker

testified that father had posted "belittling and demeaning" things about mother on his social media page just a few days before the hearing. The caseworker further testified that father had not completed his domestic violence treatment or classes.

¶ 43 To the extent father argues that termination was not in the children's best interests because he had a good relationship with them, we note that a child's bond to a parent is just one factor for the court to consider in analyzing whether any less drastic alternatives are viable. Here, even after considering the testimony about the children's bond with father, the juvenile court still concluded, based on the children's needs, that termination was in their best interests. We cannot reweigh this evidence. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

¶ 44 Therefore, because the record supports the juvenile court's finding that termination, not an APR, was in the children's best interests, we discern no basis for reversal. *See B.H.*, ¶ 80.

## V. Disposition

¶ 45 The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUDGE ASHBY concur.